**INDUSTRIAL BROADCASTING COM-
PANY, Appellant,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,**

**WSM, Inc., Intervenor.**

**No. 23856.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 21, 1970.

Decided Dec. 16, 1970.

Mr. Benedict P. Cottone, Washington, D. C., with whom Messrs. W. Ervin James, Houston, Tex., and David Meyers, Washington, D. C., were on the brief, for appellant.

Mr. Joseph A. Marino, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, and John H. Conlin, Associate

---

General Counsel, Federal Communications Commission, were on the brief, for appellee. Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, also entered an appearance for appellee.

Messrs. R. Russell Eagan and Erwin G. Krasnow, Washington, D. C., were on the brief for intervenor.

Before BAZELON, Chief Judge, WILBUR K. MILLER,* Senior Circuit Judge, and McGOWAN, Circuit Judge.

PER CURIAM:

Appellant, the licensee of a Class II AM radio station (KIKK) in Pasadena, Texas, brings this appeal from a decision of the Federal Communications Commission denying it a waiver of the so-called "pre-sunrise rules."

This controversy stems from the natural phenomenon which causes radio waves to travel further distances at night than during the day, thereby interfering with the signals of local stations during the nighttime hours and depriving local listeners of high quality reception. The Commission has attempted to combat this disruptive situation by creating radio frequency allocation patterns designed to keep this interference at a minimum.[1] One method of allocation is to restrict nighttime service on certain frequencies (Clear Channels) to one station of high power. Those stations which are so permitted to continue broadcasting throughout the night are referred to as Class I stations. Conversely, most other stations assigned to

the same frequency, but restricted to daytime service, are called Class II stations.

Since true daytime conditions do not exist until two hours after sunrise, most Class II stations have been restricted by the terms of their licenses from beginning operations until well after the pre-dawn hours. However, because these pre-dawn hours became so popular, in 1941 the Commission fashioned an exception to this restriction (47 CFR § 73.87(9) (2)). Class II stations were permitted to commence operations at 4:00 A.M., except for those located to the west of a Class I station operating on the same frequency. This latter group of Class II stations, of which KIKK is a member, was prohibited from operating prior to the time of sunrise at the easterly Class I station on the same frequency.

In 1967, the Commission instituted rulemaking proceedings in order to reexamine the exceptions pertaining to pre-dawn operations. Presunrise Operation by Standard Broadcast Stations, 8 F.C.C.2d 698, aff'd, WBEN, Inc. v. United States, note 1 *supra*. The impetus for this reexamination stemmed from numerous allegations by many full-time stations that their signals were being interfered with by an increasing number of daytime-only stations utilizing the pre-dawn exceptions. Upon consideration of various proposals, the Commission adopted a rule requiring Class II stations located to the west of Class I stations, such as KIKK, to refrain from operation until 6:00 A.M. local time or sunrise at the dominant Class I station, whichever is later.[2] Moreover, the Com-

* WILBUR K. MILLER, Senior Circuit Judge, did not participate in the disposition of this case.

1. For a thorough explanation of the dynamics underlying the functioning of radio waves at night, as well as a thorough discussion of the Federal Communication Commission's allocation patterns, *see* WBEN, Inc. v. United States, 396

F.2d 601 (2d Cir. 1968), cert. denied, King's Garden, Inc. v. F.C.C., 393 U.S. 914, 89 S.Ct. 238, 21 L.Ed.2d 200 (1968).

2. For Class II stations located to the east of the dominant station on the channel, pre-sunrise operation was flatly proscribed by the Commission.

mission required that any station intending to utilize this exception must seek Pre-Sunrise Authority (PSA) from the Commission. The Commission also announced that in due course it would reexamine these policies, with special emphasis to be placed upon the determination of whether PSA-authorized stations should be required to operate at less than full daytime power during their pre-dawn operations.

Accordingly, the Commission reinstituted proceedings in July, 1969. Pre-sunrise Operations, 18 F.C.C.2d 705 (1969). Aside from exploring the problems concerning broadcast power, the Commission also entertained fresh objections concerning the existing pre-sunrise exceptions from a myriad of Class II stations.[3] Three arguments were made as to why these exceptions should be widened: The Commission had (1) utilized inappropriate engineering statistics to gauge the extent of interference; (2) failed to utilize listener complaints as a serious barometer of the degree of interference; and (3) not considered the importance of programming in the development of these rules.

The Commission, however, endorsed the procedures it had established in 1967. The objections to the engineering statistics employed were met by a finding that the same results would be reached using any of the standards proffered by the various Class II stations. Of the argument that the absence of interference complaints from the listening public could be considered as a significant decisional factor, the Commission stated that many listeners had become adjusted to poor reception during the early morning hours, believed that such

interference was a "way of life", and thought that no better service could be provided. The Commission further explained that the purpose of the pre-sunrise rules was not simply to maintain the status quo, but to improve the quality of radio reception beyond what the public had come to expect. In response to the third argument, the Commission explained that little weight could be given to "unique" programming in resolving what was essentially a highly technical problem of frequency allocation.

Appellant is authorized to operate only in the daytime in Pasadena, Texas, a city contiguous to Houston. Since its inception 22 years ago, KIKK has been required by the terms of its license and by the Commission's rules to conduct its operation in such a manner as not to interfere with Station WSM, Nashville, Tennessee. WSM was the only station on that frequency permitted to operate throughout the night, and in that capacity served large sections of the southeastern and southwestern portions of the country. Despite KIKK's restrictions, however, an FCC field office inspection conducted in September, 1969, uncovered the fact that KIKK had been regularly broadcasting at 6:00 A.M. local time, which was prior to sunrise in Nashville during the fall and winter months.

Shortly after this discovery, KIKK applied for and received a PSA consistent with the terms of the rule, that is to say, a sign-on time of 6:00 A.M. or sunrise at Nashville, which ever occurs later.[4] KIKK also requested a waiver of the rule to permit a 6:00 A.M. sign-on throughout the year. In its application for this waiver, KIKK raised the same three issues which had been considered by the Commission at the rulemaking

3. KIKK was not among this group, having failed to participate in either the 1967 or 1969 proceedings.

4. Denial of the waiver means that from September through April (except for March) KIKK's sign-on time is delayed from 15 minutes to one hour beyond 6:00 A.M.

proceeding a few months before. With regard to the issue concerning the failure of the Commission to consider programming, KIKK maintained that it was the only English-speaking station in Pasadena, and that its early morning broadcasts were, accordingly, important to the English-speaking population of Pasadena.

The Commission denied KIKK's waiver application, finding that KIKK was simply seeking a relitigation of matters which had already been resolved in the recently completed rulemaking proceeding. In addition, the Commission again emphasized that, under any method of engineering computation, KIKK would be shown to interfere with WSM "throughout all or portions of [ten] states." With regard to KIKK's programming claim, it was noted that there were

> "20 unlimited English language and broadcast services * * * in the Houston metropolitan area, of which Pasadena is a part. Under these circumstances, KIKK's status as Pasadena's only English language station is not a valid reason for removing operating constraints * * *."

■■ It is now claimed by appellant that the Commission did not fully consider its arguments, and that, at the very least, an evidentiary hearing should have been accorded. However, reviewing courts are naturally hesitant to require an agency to carry out extensive waiver proceedings once it has carefully promulgated a general rule. Thus, a heavy burden traditionally has been placed upon one seeking a waiver to demonstrate that his arguments are substantially different from those which have been carefully considered at the rulemaking proceeding. *See, e. g.,* WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 418 F.2d 1153, 1156 (1969). In this manner, one of the foremost advantages of rulemaking—the formulation and effectuation of agency policy with a minimum expenditure of time and resources —will not be undermined by the necessity for continuous case-by-case adjudication. At the same time flexibility is maintained by requiring the agency to take a "hard look" at novel proposals raised by applicants at a later date.[5] It is quite clear that KIKK has presented no new expedients to the Commission not envisaged by the rules calculated to satisfy the objectives underlying them. Instead, it has merely raised broad questions about the rules which the Commission had already carefully dealt with. This record provides us with no occasion to disturb the Commission's order under review.

Affirmed.

---

5. In *WAIT*, this court required the Commission to reexamine an application for waiver by a Class II AM radio station. In that case, the applicant wanted to broadcast throughout the night. In order to mitigate any interference with the Class I station on its frequency, it submitted a proposal which called for the deflection of its nighttime signal in such a way that there would be minimal interference with the dominant station. *See,* in this regard, the Memorandum Opinion and Order of the Commission released September 14, 1970, in *Broadcasting Company of the Carolinas.* The court held that the Commission had treated this novel proposal in a perfunctory fashion, and remanded the case in order that the Commission could take a harder look, which would include a full evidentiary hearing.