**ASHLAND EXPLORATION, INC., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 78–2063.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 7, 1979.

Decided May 29, 1980.

Richard F. Generally, Washington, D.C., with whom John H. Burnes, Jr., Washington, D.C., was on the brief, for petitioner.

Barbara J. Weller, Atty., Federal Energy Regulatory Commission, Washington, D.C., with whom Howard E. Shapiro, Sol., Federal Energy Regulatory Commission, Washington, D.C., was on the brief, for respondent.

Before BAZELON, Senior Circuit Judge, TAMM, Circuit Judge, and HAROLD H. GREENE,* U.S. District Judge for the District of Columbia.

Opinion for the court filed by District Judge HAROLD H. GREENE.

HAROLD H. GREENE, District Judge:

This case involves yet another phase of the advance payment program initiated by the Federal Power Commission[1] in 1970 which has been before this Court several times.[2] The question in this case is whether advance payments "earned"[3] prior to the issuance by the Commission of Opinion 770A (see *infra*) could validly be subjected to the carrying charge credit mandated by that Opinion.

I

As originally established, the advance payment program authorized an interstate pipeline making advance payments to natural gas producers to capitalize such payments and include them in its rate base.[4] This concession was allowed on the theory that it would provide the producers with the capital needed to stimulate gas production for the benefit of the pipeline making the payments. The monies advanced in this manner were to be paid back to the pipeline in kind or in future gas deliveries.[5] The principal benefits of an advance payment to a producer have been said to be[6] that (1) it supplies capital to supplement other funds

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. The Federal Power Commission was succeeded by the 'Federal Energy Regulatory Commission with respect to the regulatory responsibilities on October 1, 1977. Department of Energy Organization Act, P.L. 95–91, 91 Stat. 565 (Aug. 4, 1977); Executive Order No. 12009, 42 Fed.Reg. 46267 (Sept. 15, 1977).

2. See *Public Service Com'n, State of N.Y. v. FPC*, 151 U.S.App.D.C. 307, 467 F.2d 361 (1972); *Public Service Com'n, State of N.Y. v. FPC*, 167 U.S.App.D.C. 100, 511 F.2d 338 (1975); *Michigan Wisconsin Gas Pipe Line Co. v. FPC*, 171 U.S.App.D.C. 352, 353–54, 520 F.2d 84, 85–86 (1975); *United Gas Pipe Line Co. v. FPC*, 179 U.S.App.D.C. 274, 276, 551 F.2d 460, 462 (1977); *American Public Gas Association v. FPC* (*The Second National Natural Gas Rate Cases*), 186 U.S.App.D.C. 23, 59–64, 567 F.2d 1016, 1052–57 (1977), cert. denied, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978); *Tennessee Gas Pipeline Co. v. FERC*, 196 U.S.App. D.C. 187, 606 F.2d 1094 (1979).

3. Petitioner refers to payments to be made under preexisting contracts which represent funds actually spent or for which commitments had been made as "earned" payments.

4. The advances had to be "responsible and appropriate." Order No. 465, 48 FPC 1554; Order No. 499, 50 FPC 2111; *Tennessee Gas Pipeline Co. v. FERC, supra*, note 2.

5. The advance payment program was governed by five orders prior to its ultimate termination. Order No. 410, Accounting and Rate Treatment of Advance Payments to Suppliers for Gas and Amending F.P.C. Form No. 2, Docket No. R–380, 44 FPC 1142 (1970) (governing advances made pursuant to contracts entered after October 2, 1970); Order No. 410–A, Accounting and Rate Treatment of Advance Payments to Suppliers for Gas, and Amending F.P.C. Form No. 2, Docket No. R–380, 45 FPC 135 (1971); Order No. 441, Accounting and Rate Treatment of Advance Payments to Suppliers for Exploration and Lease Acquisition of Gas Producing Properties, Docket No. 4–411, 46 FPC 1178 (1971); Order No. 465, Accounting and Rate Treatment of Advance Payments Included in Account 166, Advance Payments for Gas Development and Production, Docket No. R–411, 48 FPC 1550 (1972); Order No. 499, Accounting and Rate Treatment of Advances Included in Account No. 166, Advances for Gas Exploration, Development and Production, Docket No. RM74–4, 50 FPC 2111 (1973) (governing contracts executed between January 1, 1974 and December 31, 1975).

6. *Tennessee Gas Pipeline Co. v. FERC, supra*, 196 U.S.App.D.C. at 199, 606 F.2d at 1102.

available for development and production expenditures, (2) it constitutes an interest-free loan, and (3) the rate set by the Commission incorporates an allowance for financing costs, but no reduction in that rate is required on account of the fact that part of the financing is cost-free.

The advance payment program was sanctioned by this Court as a "justifiable experiment" in the search for solutions to the natural gas shortage. *Public Service Comm'n for the State of New York v. Federal Power Commission,* 151 U.S.App.D.C. 307, 317, 467 F.2d 361, 371 (1972). Several years later we concluded, however, that the Commission had failed adequately to analyze and evaluate the impact of the program so as to justify its extension or expansion, and we ordered it to consider the matter again. *Public Service Commission for the State of New York v. FPC,* 167 U.S.App.D.C. 100, 511 F.2d 338 (1975).[7]

On remand, after further consideration, the Commission issued an order, dated on December 31, 1975, which directed the discontinuance of the advance payment program.[8] The order provided that no advance payments made pursuant to contracts executed after that date were to be eligible for rate base treatment, but the inclusion in a pipeline's rate base through December, 1980, of advance payments made under pre-existing agreements continued to be permitted.[9]

In a further order, issued February 27, 1976, which amended and clarified the December 31, 1975, order, the Commission explained that the "intent of the December 31, 1975, order was to terminate the advance program as of the *time* and *date* of the order such that advances made pursuant to contracts .executed after the time and date of the December 31, 1975, order would be denied rate base treatment." The second order explicitly provided that the advance payment program "expired" as of 10:40 A.M., E.S.T., on December 31, 1975.

Pipelines continued thereafter to make additional advance payments under executory portions of pre-existing contracts on a vast scale. In response to this problem the Commission, on November 5, 1976, issued Opinion 770–A,[10] which recited that approximately $1.8 billion of advance payments were yet to be made by pipelines to producers under advance payment contracts, and that, by being required to pay the carrying charges on these additional advance payments, consumers were being subjected to a burden without concomitant benefits. The Commission added that an even greater amount could be paid under various incentive clauses, and accordingly it decided that "a person or a natural gas company who accepts advance payments made on or after 1 p. m., E.S.T., November 5, 1976, under an existing advance payments contract shall be entitled to charge the rates set forth herein and in subsequent biennial reviews *less a carrying charge credit*" (emphasis added).[11]

7. Pending such reconsideration, the program remained in effect.

8. Accounting and Rate Treatment of Advances Included in Account No. 166, Advances for Gas Exploration, Development and Production, Docket Nos. R–411 and RM74–4 (Order on Remand for Court Opinion Terminating Investigation and Terminating Programs with Conditions) (December 31, 1975); (Order on Rehearing Clarifying and Amending Prior Order and Granting Petition to Intervene) (February 27, 1976). The Commission determined that the program did not have the impact on off-shore reserves that had originally been expected and that, although onshore advance payments did generate additional gas, such development could also be assured through rate relief.

9. Such payments were required to qualify under the conditions imposed by the applicable

rulemaking order. The Commission excluded from the rate base any advances on prospects or tracts added to existing advance payment contracts after the date of the order.

10. Opinion 770, issued July 27, 1976, and Opinion 770–A at the same time established natural gas rates which were generally higher than those which had been in effect previously.

11. The Opinion directed that "the resulting adjusted rate shall be employed in the discharge of the obligations of any advance payments made after 1 p. m., E.S.T., November 5, 1976, for all gas delivered until an amount of gas has been delivered at the adjusted rate which has been reduced by total carrying charge credits equal to the amounts lawfully collected by the jurisdictional pipeline company as a result of including the advances in rate base."

It was noted that, because of the likelihood that the applicable carrying costs were higher than the interest rates producers would be required to pay on conventional loans, they would be encouraged to renegotiate or terminate the executory provisions of existing contracts so as to eliminate the legal obligation of pipelines to continue to make the payments.

This Court reviewed Opinion 770–A and affirmed the Commission's new treatment of the advance payments program. *American Public Gas Association v. FPC (The Second National Gas Rate Cases)*, 186 U.S. App.D.C. 23, 567 F.2d 1016, 1052–57, *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).

On January 13, 1977, petitioner Ashland Exploration, Inc., filed with the Commission a petition for a declaratory order which would have authorized Ashland to receive the rates prescribed by Opinions 770 and 770–A for certain volumes of gas committed to Trunkline Gas Company [12] without reduction by the carrying charge credit. The petition claimed that the supplemental advance payment had been "earned" prior to the date of issuance of Opinion 770–A, and could have been, but was not, received by that date.

Specifically, it appeared that Ashland had entered into an advance payment agreement with Trunkline in May, 1974, providing for a payment of $20,390,000.[13] Under the terms of this agreement Ashland had the right to request supplemental advance payments when its development costs exceeded the amount of the initial advance and when a certain amount of reserves had been developed. On November 2, 1976, Ashland requested an additional advance in the amount of $4,870,433 pursuant to this provision. This requested payment repre-

sented funds which Ashland had committed itself to spend before Opinion 770–A was issued and, indeed, a portion of the supplemental advance payment request apparently was to compensate it for costs actually incurred for drilling conducted prior to the date of that Opinion.

After Opinion 770–A issued, Trunkline inquired whether, in light of the now applicable carrying charge, Ashland still desired the payment. In response, Ashland withdrew its request without prejudice to a subsequent resubmittal, and it filed instead its petition with the Commission. The Commission denied the petition on July 7, 1978,[14] and a request for rehearing was denied by operation of law.[15] A petition for review to this Court followed.[16]

## II

■ The issues here are relatively narrow. Ashland does not contend that the Commission lacked the authority to assess a carrying charge credit, nor does it contest the Commission's power, in general, to make this policy effective immediately upon the issuance of Opinion 770–A.[17] Its argument is that the policy could not lawfully be applied in a circumstance where the advance payment was "earned" and could have been received prior to that date. In these respects, Ashland claims, the advance payments at issue here are not typical of those intended to be reached by the Commission on November 5, 1976, and they do not fit the bases for the Commission's order rejecting Ashland's petition.

That order recited that the November 5, 1976, cutoff date was chosen to coincide with the issuance of Opinion 770–A because (1) prior to the receipt of payment the producer has the option to seek alternative

---

12. This gas was committed to offshore areas in Louisiana.

13. This was subsequently reduced to $13,886,344.

14. Ashland Oil, Inc. FERC Docket No. RM7514.

15. Section 1.34(c) of the Commission's regulations, 18 C.F.R. § 1.34(c).

16. Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b).

17. Such agency actions are clearly valid. See *City of Chicago v. FPC*, 128 U.S.App.D.C. 107, 385 F.2d 629, 641–42 (1967), *cert. denied*, 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968).

methods of financing, and (2) this timing prevented a possible flood of last-minute payments. Ashland contends that neither of these considerations applies to its relationship with Trunkline, and that the Commission's action with respect to it was overly mechanical and, hence, arbitrary and capricious.

We do not find these arguments persuasive even on their own terms. The alternative-means-of-financing rationale applies whether or not a requested advance payment is designed to compensate for costs incurred for drilling undertaken prior to Opinion 770–A. The Opinion does not invalidate such advance payment agreements; it merely imposes a carrying charge credit if they are to be implemented. To be sure, this new requirement encourages and therefore might result in the renegotiation of existing agreements. However, as long as actual payment has not been made, there is no reason why, even then, alternative methods of financing may not be negotiated and agreed upon between the parties. In short, Ashland retains the option the Commission envisioned in the order.

As for the second prong of Ashland's argument, it may well be true that the particular payments here at issue could not fairly be characterized as "last-minute." Having been spent or committed prior to the issuance of Opinion 770–A, they may not have been induced by the anticipated termination of the advance payment program, although that possibility cannot wholly be excluded. While the December 31, 1975, and the February 27, 1976, orders were being considered, and particularly after they had been issued, it must have become apparent to knowledgeable persons in the industry that the remnants of the program rested on increasingly shaky foundations.

The more fundamental problem with Ashland's argument, however, is that it would measure the scope and application of Opinion 770–A solely by the language the Commission used in its order denying that producer's application for exemption from the regulation established by the prior Opinion. The denial order may have relevance on the issue of the adequacy of the explanation provided by the agency when it refused to grant Ashland a waiver from the general regulation (see note 24 *infra*), but on the crucial question of whether arrangements such as those between Ashland and Trunkline were intended to be reached by Opinion 770–A, we must look to that Opinion rather than to subsequent individual orders.[18] Opinion 770–A imposed the carrying charge credit, and it necessarily determined the situations in which that credit was to apply. The July 7, 1978, order, to be sure, recited reasons for the general cut-off; but it neither defined the dimensions of that cut-off nor exhausted the list of situations to which it applied.[19]

The Commission was faced in 1975 with the problem of terminating a program which, however well-intentioned it had been at its inception, had turned out on the basis of experience to be no longer justified. Not only had the advance payment program failed to fulfill its promise of stimulating the exploration of significant additional supplies of gas, but its continued operation has subjected consumers to unjust and unreasonable rates. See *Atlantic Refining Co. v. Public Service Commission*, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959).

The Commission met this challenge, first, by its December 31, 1975 order (as amended on February 25, 1976)—which made clear that the advance payment program was being terminated as of December 31, 1975— and second, by dealing in Opinion 770–A

---

18. See *Tennessee Gas Pipeline Co. v. FERC, supra*, 196 U.S.App.D.C. at 204, 606 F.2d at 1110.

19. It might have been preferable had the Commission made its underlying rationale explicit again in its order denying Ashland's petition

and those of other, similar petitioners, which the parties have brought to our attention. (Incidentally, denial of all such petitions tends to support the conclusion that the Commission never intended Opinion 770–A to establish anything other than an inflexible cut-off.)

with the remaining executory portions of pre-existing contracts. Upon being confronted at that time with a choice between engaging in individual assessments with respect to each such contract and a definitive termination, the Commission opted in favor of certainty and hence all-inclusiveness. The thrust of the Opinion was that the ill-fated advance payment program was to be ended quickly and cleanly, and that the termination order was to include the remnants left after the bulk of the program had ended on December 31, 1975.

The language of the Opinion leaves no room for any inference other than that the only aspect of the program which was to remain in force after November 5, 1976, was the producers' option to receive advance payments not actually made by that date subject to the carrying charge credit. To that end, the Opinion stated, without ambiguity or reservation, that any producer which "accepts advance payments made" after that date shall have its rates reduced by the carrying charge credit. As we stated in *American Public Gas Association v. FPC, supra*, 567 F.2d at 1057:

> Rather than incorporate into its new national rate all of the complications arising from its discontinued experiment, the Commission chose to make a "clean start" —to disregard those payments advanced prior to the new rates, but to adjust

strictly for any payments made in the future.[20]

It is likewise clear that the Commission had the power to do just that, and that this court must not interfere with the Commission's decision. It is familiar doctrine that reviewing courts should accommodate agency flexibility to permit adjustments based on exigencies of administration;[21] that "the common law of public utility rate regulation pragmatically accepts the futility of embroiling current and future rate regulation with a function of making correctives of excess or insufficiency of rates charged in the past";[22] and that an agency confronted with as complex a task as unwinding the advance payment program may rationally turn to simplicity in ground rules and administrative convenience, at least where no fundamental injustice is caused.[23]

■ The Commission conceivably could have attempted to decide on application of the carrying charge credit on a case-by-case analysis of the likelihood of success of individual renegotiation efforts or of the motives of each producer in accepting further advance funds. It did not choose that path, instead opting for certainty. This was a valid decision well within its discretion, and it may not be set aside on grounds of arbitrariness unless it can be shown that a particular producer is entitled to an exemption or waiver on equitable grounds.[24] We now turn to that subject.

---

**20.** It is also significant in this respect that Ashland's situation is neither unique nor untypical. A considerable number of agreements between producers and pipelines apparently provided for advance payments on an installment basis to be made at regular intervals far beyond the ultimately selected cut-off date. Ashland's November 2, 1976, request for another advance from Trunkline was no different, and it may thus presumed to be precisely within the category of cases intended by the Commission to be covered by the cut-off announced three days later. Certainly, at a minimum, the Commission could so construe its own prior decision. *Udall v. Tallman*, 380 U.S. 1, 16–18, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965). On that basis, the Commission rightfully rejected a petition which, whatever its protestations of acceptance of the principle established by Opinion 770–A, might have largely gutted the termination program in practice.

**21.** *Mobil Oil Corp. v. FPC*, 417 U.S. 283, 329, 94 S.Ct. 2328, 2355, 41 L.Ed.2d 72 (1974).

**22.** *American Public Gas Association v. FPC, supra*, 567 F.2d at 1057.

**23.** *Gulf Oil Corp. v. Hickel*, 140 U.S.App.D.C. 368, 374, 435 F.2d 440, 446 (1970).

**24.** Agency action is also vulnerable on review if there is a failure to provide a reasoned analysis for the decision, *Boston Edison Co. v. FPC*, 181 U.S.App.D.C. 222, 557 F.2d 845, 848–49 (1977), *cert. denied*, 434 U.S. 956, 98 S.Ct. 482, 54 L.Ed.2d 314 (1978); *Distrigas of Massachusetts v. FPC*, 517 F.2d 761, 765 (1st Cir. 1975), or to take into consideration factual distinctions between various cases. *Michigan Wisconsin Pipe Line Co. v. FPC*, 171 U.S.App.D.C. 352, 520 F.2d 84, 89 (1975). As discussed *supra*, the basic decision with respect to Ashland's claim was made in Opinion 770–A, and the Commis-

## III

Ashland's equitable claim is not compelling.

■ The regulations provide on their face for the imposition of a carrying charge credit with respect to any and all advance payments made after November 5, 1976. The Commission may, indeed, it must, adhere to those regulations absent an extraordinary showing by an affected person that he is entitled to an exemption or waiver. *WAIT Radio v. FCC,* 135 U.S.App.D.C. 317, 418 F.2d 1153, 1156 (1969), *cert. denied,* 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972); *Basic Media, Ltd. v. FCC,* 182 U.S. App.D.C. 209, 559 F.2d 830, 833–34 (1977); *Industrial Broadcasting Co. v. FCC,* 141 U.S.App.D.C. 247, 250, 437 F.2d 680, 683 (1970). An applicant for such a waiver has the burden of convincing the agency that it should depart from its general rules and of demonstrating to the reviewing court that the agency's reasons for refusing to do so were so insubstantial so as to amount to an abuse of discretion. *Sudbrink Broadcasting, Inc. of Florida v. FCC,* 166 U.S.App. D.C. 85, 509 F.2d 418, 422 (1974); see also generally, *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 444 F.2d 841 (1940), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

■ Ashland's claim is bottomed on the proposition that, having made commitments based upon the existence of the advance payment program including its interest-free loan feature, it is inequitable now to require it to assume the burden of the carrying charge credit (or to renegotiate the prior agreement). That claim might have some merit were it not for the fact that the rate structure established by Opinions 770 and 770–A includes an adequate return on investment without consideration of advance payments. *American Public Gas v. FPC, supra,* 186 U.S.App.D.C. at 60, 567 F.2d at 1053.[25] Whatever may have been the expectations of some producers, the Commission could reasonably conclude that they should not be entitled both to such a return and to the interest-free loans represented by the advance payment program.[26] See *Gillring Oil Co. v. FERC,* 566 F.2d 1323 (5th Cir. 1978), *cert. denied,* 439 U.S. 823, 99 S.Ct. 91, 58 L.Ed.2d 115 (1978), where the court rejected a contention, advanced on equitable grounds, that a producer be permitted to reduce required refunds to the extent that its rates in prior years had been below the maximum rates allowed by the Commission.[27]

Especially in view of the responsibility of the Commission under sections 4 and 5 of the Natural Gas Act, 15 U.S.C. §§ 717c and

---

sion's rationale with respect thereto was upheld by this court in *American Public Gas Association v. FPC, supra.* Since, for the reasons discussed above, there are no material factual differences between Ashland's situation and others affected by Opinion 770–A, there was no requirement for an analysis or explanation beyond that provided here. But see, note 19 *supra.*

**25.** For that reason, Ashland's reliance on *Tenneco Oil Co. v. FERC,* 571 F.2d 834 (5th Cir. 1978) is misplaced. That case held that the Commission erred when it required producers to waive their established rights to refund credits under certain circumstances. The court reasoned that it was arbitrary to leave producers with a choice to "waive the credit . . . or [to] charge an area rate which is below the national ceiling rate that the Commission had now found just and reasonable . . . ." 571 F.2d at 849. Here it has been established that the new national rates include a full return on

investment to the producers, and it cannot be said that Ashland bargained with the pipeline for an interest-free loan in addition to such a return.

**26.** Ashland does not contend that the rates established by Opinion 770 as modified by Opinion 770–A are not cost based or that they do not meet the test of *FPC v. Hope Natural Gas Company,* 320 U.S. 591, 605, 64 S.Ct. 281, 289, 88 L.Ed. 333 (1944) (rates should enable each company "to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed").

**27.** Among the considerations advanced by the court for its conclusion was the fact that the national rate then in effect included a price incentive for exploration and development which was to operate in place of the program upon which the producer was basing its claim.

717d, to protect consumers,[28] and its wide range of discretion which may not be disturbed as long as it is exercised within a zone of reasonableness,[29] we conclude that Ashland has not carried its burden.

For the reasons stated, the order of the Commission is

*Affirmed.*

---

**28.** See *Atlantic Refining Co. v. Public Service Company, supra*, 360 U.S. at 388, 79 S.Ct. at 1253; *American Public Gas Association v. FPC, supra*, 567 F.2d at 1054 ("we will not disturb the Commission's implicit judgment that the alleged hardship to the producer is outweighed by the public's interest in cost-leased rates"); and *Smyth v. Ames*, 169 U.S. 466, 546, 18 S.Ct. 418, 433, 42 L.Ed. 819 (1898) (an item may be included in a rate base only when it is "used and useful" in providing service).

**29.** *FERC v. Pennzoil Producing Co.*, 439 U.S. 508, 99 S.Ct. 765, 58 L.Ed.2d 773 (1979) (discretion to withhold relief from harsh application of regulatory principles is not abused unless rate levels border on the confiscatory); *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585, 62 S.Ct. 736, 742, 86 L.Ed. 1037 (1942).