**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, LOCAL 1968, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent.**

No. 81–1274.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 4, 1981.

Decided Oct. 12, 1982.

**104.** 5 U.S.C. §§ 7701(c)(1)(A) (Supp. IV 1980); see *id.* § 7121(e)(2).

**105.** See *id.* § 4302.

William J. Stone, Washington, D. C., with whom James R. Rosa, Washington, D. C., was on the brief, for petitioner.

Mary Elizabeth Medaglia, Associate Sol., Fed. Labor Relations Authority, with whom Marian R. Fox, and Dawn D. Bennett-Alexander, Attys., Fed. Labor Relations Authority, Washington, D. C., were on the brief, for respondent.

Before ROBINSON, Chief Judge, WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Chief Judge:

Petitioner, Local 1968 of the American Federation of Government Employees, AFL–CIO, brings on for review a decision and order of the Federal Labor Relations

Authority holding that three of petitioner's labor proposals encroach upon rights reserved to agency management by the Federal Labor-Management Relations Act,[1] and are thus not subjects of mandatory collective bargaining. In light of the principles articulated by this court in *Department of Defense v. FLRA*[2] and *National Treasury Employees Union v. FLRA*,[3] the latter issued today, we affirm the Authority's outcome.

I

The statutory and regulatory context in which this case arose is reviewed at some length in *National Treasury Employees Union*,[4] and need be only briefly recapitulated here. Under the Federal Labor-Management Relations Act, federal agencies are required to bargain with employees or their union representatives over "condition[s] of employment,"[5] but only to the extent consistent with federal law or regulations.[6] The federal law most relevant here is Section 7106(a) of the Act, which reserves to management the right to "direct employees"[7] and "assign work."[8] The Act also

instructs federal agencies to establish employee-performance appraisal systems,[9] the key components of which are "performance standards" for and "critical elements" of the job.[10]

During collective bargaining between petitioner and the Department of the Treasury, a dispute arose over the negotiability of certain of petitioner's proposals regarding the Department's development of a performance-appraisal system. The Department concluded that the italicized portions of the following proposals were nonnegotiable:

*PROPOSAL I*

*Section 1. The parties agree that critical elements of a position used for performance appraisal will be based only on the grade controlling factors of a position* for which there will be an accurate position or job description. *Such critical elements for performance appraisals will be weighted in direct proportion to the relative importance in grade determination* ....[11]

[u]nder regulations which the Office of Personnel Management shall prescribe, each performance appraisal shall provide for—(1) establishing performance standards which will, to the maximum extent feasible, permit the accurate evaluation of job performance on the basis of objective criteria ... related to the job in question for each employee or position under the system.

These appraisals are to be used in rewarding, promoting, reducing in grade, retaining and removing employees. *Id.* § 4302(a)(3).

1. This is the appellation commonly placed on Title VII of the Civil Service Reform Act of 1978, Pub.L.No. 95–454, 92 Stat. 1192, 5 U.S.C. §§ 7101 *et seq.* (Supp. IV 1980).

2. 212 U.S.App.D.C. 256, 659 F.2d 1140 (1981).

3. 223 U.S.App.D.C. ——, 691 F.2d 553 (1982).

4. 223 U.S.App.D.C. ——, 691 F.2d at 554.

5. 5 U.S.C. § 7114(a)(5)(B) (Supp. IV 1980). "Conditions of employment" are defined, with exceptions not pertinent here, as "personnel policies, practices, and matters, whether established by rule, regulation or otherwise, affecting working conditions." *Id.* § 7103(a)(14).

6. *Id.* § 7117(a)(1), stating that "the duty to bargain in good faith shall, to the extent not inconsistent with any Federal law or any Government-wide rule or regulation, extend to matters which are the subject of any rule or regulation only if the rule or regulation is not a Government-wide rule or regulation."

7. *Id.* § 7106(a)(2)(A), quoted *infra* note 37.

8. *Id.* § 7106(a)(2)(B), quoted *infra* note 37.

9. *Id.* § 4302(b)(1), providing that

10. See 5 C.F.R. 430.202(d), (e) (1982); *National Treasury Employees Union v. FLRA, supra* note 3, at 555–556. A performance standard is the "expressed measure of the level of achievement established by management for the duties and responsibilities of a position [and may include] ... elements such as quantity, quality, and timeliness." 5 C.F.R. 430.202(d) (1982). A critical element is a "component of an employee's job that is of sufficient importance that performance below the minimum standard established by management requires remedial action...." *Id.* § 430.202(e).

11. Petitioner also submitted a Proposal II, which specified:

Section 3. Employees' annual performance rating will be the result of the applica-

## PROPOSAL III

*Section 4.* There shall be no secret studies bearing on performance appraisals. All studies conducted by the [employer] will be conducted on typical workers under normal working conditions. *The Union shall participate on an equal basis in the development or revisions of all measures of performance and studies including but not limited to selection of typical workers and conditions. If agreement cannot be reached, formal negotiations will be convened. Any impasses will be referred to the Federal Service Impasses Panel for resolution.*

## PROPOSAL IV

*Section 6. Any disputes under this Article may be resolved under the negotiated grievance procedure including but not limited to:*

1. *Challenges to critical elements of position.*

2. *The measure of performance as set forth in performance standards.*[12]

As was its privilege under the Act,[13] petitioner obtained administrative review by the Federal Labor Relations Authority of the Department's determinations. The Authority ruled that the disputed portions of the proposals invaded areas confided to management by Section 7106(a),[14] and thus were outside the agency's statutorily-imposed duty to bargain.[15] In so concluding, the Authority relied upon an earlier holding[16] which we today sustain,[17] that establishment of performance standards and identification of critical job elements, as parts of an employee-performance appraisal system, are components of management's power, reserved by Section 7106(a), to direct employees and assign work, and as such are beyond the ambit of mandatory collective bargaining.[18] Applying that principle to this case, the Authority condemned each of the proposals in issue to the same fate.[19]

In restricting "critical elements of a position" for performance-appraisal purposes to those deemed grade-controlling,[20] the Authority reasoned, Proposal I limited the agency's ability to itself select critical job elements, for it could not treat as critical an element not otherwise considered grade-controlling.[21] In this respect, Proposal I, the Authority said, was materially different from one it had upheld earlier,[22] which in the Authority's words had merely prescribed "general, non-quantitative criteria under which an arbitrator could review [the] application to an employee of a per-

---

tion of standards of performance to the appropriate critical elements of a position established in accordance with [Proposal I]. The Department, citing § 7106(a), refused to bargain over this proposition as well, and on review the Authority found it unbargainable insofar as it referenced Proposal I, a decision also questioned here by petitioner. Since the negotiability of this proposal is coextensive with that of Proposal I, it need not be discussed separately, for our conclusions on Proposal I apply equally to Proposal II.

**12.** The Department also contended for nonnegotiability of a portion of Proposal IV, stipulating that "any disputed action taken as a result of a performance appraisal will be treated as any other disciplinary matter" under the negotiated grievance procedure. The Authority, however, held that the Department was obligated to engage in collective bargaining over this provision. See *American Fed'n of Gov't Employees, Local 1968,* 5 F.L.R.A. No. 14 at 8–9 (Feb. 9, 1981), [hereinafter cited as *AFGE Local 1968*]. The Department has not sought review of this ruling.

**13.** See 5 U.S.C. § 7117(c)(1) (Supp. IV 1980).

**14.** *Id.* § 7106(a).

**15.** *AFGE Local 1968, supra* note 12.

**16.** *National Treasury Employees Union,* 3 F.L.R.A. 769 (1980) [hereinafter cited as *NTEU*].

**17.** *National Treasury Employees Union v. FLRA, supra* note 3.

**18.** *NTEU, supra* note 16, 3 F.L.R.A. at 770.

**19.** *AFGE Local 1968, supra* note 12, at 2, 7, 8–9.

**20.** See text *supra* at note 11 (text of proposal).

**21.** *AFGE Local 1968, supra* note 12, at 2.

**22.** *Id.* at 3; see *American Fed'n of Gov't Employees, Local 32,* 3 F.L.R.A. 783 (1980) [hereinafter cited as *AFGE Local 32*].

formance standard established by agency management."[23] In contrast, Proposal I, the Authority declared, established a substantive criterion—classification as grade-controlling—in obedience to which critical job elements must be designated.[24] The Authority thus concluded that this proposal directly interfered with management's reserved authority under Section 7106(a) to direct employees and assign work through use of critical job elements identified by management alone.[25]

Continuing, the Authority ruled that Proposal III, which envisioned equal union participation in development and revision of measures of performance, and called for formal negotiations on related disputes and possible resort to the Federal Service Impasses Panel,[26] was inconsistent with management's rights.[27] Because this proposal would require bargaining to impasse on questions concerning the particular performance standards to be adopted, the Authority deemed it indistinguishable from that condemned in *National Treasury Employees Union*.[28] On the basis of that earlier holding, Proposal III was held to be outside the duty to bargain.[29]

Lastly, the Authority repulsed the petitioner's attack on Proposal IV, which would make grievance procedures applicable to disagreements growing out of the establishment and operation of performance-appraisal systems.[30] Stating that a negotiated grievance procedure may not properly extend to any matter reserved by law to agency discretion, the Authority held that this proposal would effectively subject the agency's exercise of its exclusive right to direct the employees and assign work to review by an arbitrator,[31] and therefore would empower arbitrators to nullify management's judgment on performance standards and critical job elements and to substitute their own.[32] The Authority spurned the suggestion that the proposal dealt merely with procedural matters, and as such was not shielded from negotiation,[33] and concluded that it trespassed upon the agency's reserved right to establish performance standards and identify critical job elements, and accordingly was outside the scope of the bargaining obligation.[34]

## II

Petitioner complains of the Authority's ruling on a number of grounds, many of which are effectively disposed of by *Department of Defense*,[35] which was rendered after filing of petitioner's principal brief herein, and *National Treasury Employees Union*,[36] which we announce contemporaneously with this opinion.

### A. Interpretation of the Act.

Petitioner's main challenge is to the Authority's holding that promulgation of performance standards and identification of critical job elements are ingredients of the

**23.** *AFGE Local 1968, supra* note 12, at 3.

**24.** *Id.*

**25.** *Id.* at 3.

**26.** See text *supra* at note 11 (text of proposal). When authorized negotiations reach an impasse, either party may take the dispute to the Federal Service Impasses Panel, see 5 U.S.C. § 7119(b)(1), which is empowered to take any necessary action to resolve it, *id.* § 7119(c)(5)(B)(iii), including binding arbitration and imposed settlement. See *Department of Defense v. FLRA, supra* note 2, 212 U.S.App. D.C. at 264, 659 F.2d at 1148.

**27.** *AFGE Local 1968, supra* note 12, at 7–8.

**28.** *Id.* 556–557; see note 73 *infra* (text of *NTEU* proposal); notes 42–43 *infra* and accompanying text (discussing *NTEU*).

**29.** *AFGE Local 1968, supra* note 12, at 8.

**30.** See text *supra* at note 12 (text of proposal).

**31.** *AFGE Local 1968, supra* note 12, at 10–11.

**32.** *Id.* at 11.

**33.** *Id.* at 10; see notes 60–65 *infra* and accompanying text (discussing negotiability of procedures under the Act).

**34.** *AFGE Local 1968, supra* note 11, at 10–11.

**35.** *Supra* note 2.

**36.** *Supra* note 3.

right reserved to management by Section 7106(a) of the Federal Labor-Management Relations Act to direct employees and assign work,[37] and thus are nonnegotiable. The Act, petitioner says, embodies a congressional determination that collective bargaining in the federal sector is in the public interest, and therefore is to be encouraged.[38] Toward this end, petitioner continues, the Act imposes an obligation upon federal agencies to engage in collective bargaining[39] over "conditions of employment,"[40] a term petitioner would have us define as including performance standards and critical job elements incorporated into a performance-appraisal system.[41]

■ We reject this argument for the reasons articulated in *National Treasury Employees Union*.[42] There we today affirm the Authority's determination that formulation of performance standards and designation of critical job elements for performance-appraisal purposes are within the agency's statutorily-reserved prerogative to direct employees and assign work, and therefore fall outside the obligation to bargain.[43] That holding obviously brings to naught a good many of the arguments advanced by petitioner.

Pressing a point not raised there, however, petitioner contends that Congress contemplated that performance standards would be subject to collective bargaining. In support, petitioner cites a statement by Representative Udall[44] during the House debates that Section 7106(a)(2)(C)[45] is designed

> to preserve as bargainable (to the extent permitted by applicable laws and regulations) the standards, criteria, and procedures for establishing promotion certificates, while assuring management's right to make the actual selection from the certificate.....[46]

Promotion-certificate standards and criteria, it is argued, are not materially distinct from performance standards; by analogy, Congress is said to have anticipated negotiation of the latter.[47] To this the Authority did not respond directly in its decision[48] but instead relied upon a prior agency precedent declaring that there is no "direct connection between the standards for establishing promotion certificates and performance standards."[49]

**37.** 5 U.S.C. § 7106(a)(2)(A), (B) (Supp. IV 1980), providing that:

> Nothing in this chapter shall affect the authority of any management official of any agency—
>
> \* \* \* \* \* \*
>
> (2) in accordance with applicable laws—
> (A) to hire, assign, direct, lay off, and retain employees in the agency . . .;
> (B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted.

**38.** Brief for Petitioner at 21–22, citing 5 U.S.C. § 7101 (Supp. IV 1980).

**39.** See 5 U.S.C. § 7114(a)(4) (Supp. IV 1980). Collective bargaining is there defined as "a good-faith effort to reach agreement with respect to the conditions of employment affecting . . . employees." *Id.* at 5 U.S.C.A. § 7103(a)(12).

**40.** See *id.* § 7103(a)(12); see also *id.* § 7103(a)(14) (collective bargaining defined).

**41.** Brief for Petitioner at 22–24.

**42.** *Supra* note 3.

**43.** *National Treasury Employees Union v. FLRA, supra* note 3, at 561–565.

**44.** Representative Udall was the principal author of Title VII of the Civil Service Reform Act of 1978—the legislation this case implicates. See note 1 *supra.* See 124 Cong.Rec. 29174 (1978) (remarks of Representative Udall), *reprinted in* Subcommittee on Postal Personnel and Modernization of the Committee on Post Office and Civil Service, 96 Cong., 1st Sess., Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978, at 907 (1979) [hereinafter cited as *Legislative History*].

**45.** 5 U.S.C. § 7106(a)(2)(C) (Supp. IV 1980).

**46.** 124 Cong.Rec. 29174 (1978) (remarks of Representative Udall), reprinted in *Legislative History, supra* note 44, at 925.

**47.** Brief for Petitioner at 29–30.

**48.** *AFGE Local 1968, supra* note 12, at 3.

**49.** *NTEU, supra* note 16, 3 F.L.R.A. at 778.

The term "promotion certificate" is not currently employed in the pertinent chapter of the Federal Personnel Manual,[50] suggesting that perhaps it is no longer a formal promotion mechanism. As used in sections of the Manual in effect when Representative Udall spoke, however, "promotion certificate" denoted a means by which highly or relatively more qualified applicants were selected from a pool and certified to personnel officials.[51] Performance appraisals were a factor to be considered in evaluating candidates for listing in a promotion certificate,[52] but the standards for such a listing clearly were not synonymous with those for measuring job-performance. For a given individual, the former might vary considerably with the job to which promotion was sought, while the latter remain constant with the position occupied. The Authority's conclusion that there is no "direct connection" thus is sound.

Moreover, the Udall statement reflects an intention to preserve as bargainable merely that which was so designated in the promotion certificate scheme.[53] The relevant portions of the Federal Personnel Manual indicated that employees and their organizational representatives were to participate in the development of promotion plans and guidelines,[54] but the participation envisioned was limited in several important respects. The Manual provided that employee consultation and negotiation did not extend to qualification standards or evaluation methods, or to the exercise of rights reserved to management by executive order, including assignment of duties to employees.[55]

◼ It is clear, even from this brief review, that the scope of permissible bargaining over promotion certificates was not nearly so broad as petitioner would have us believe. Representative Udall sought to maintain bargainability of the criteria applicable to promotion certificates to the extent that it was permitted under then-current laws and regulations, and pertinent regulations precluded negotiation over promotion-qualification standards and job-duty assignment. So, notwithstanding some similarity between promotion certificates and performance appraisals, petitioner's argument must fail. We discern nothing in this portion of the legislative history manifesting a congressional intent to impart negotiability to performance standards in the performance-appraisal context.

Petitioner also contends that the proposals in issue would do no more than furnish procedures to be utilized when employees are evaluated,[56] and thus are made bargainable by Section 7106(b)(2),[57] providing that "[n]othing in [the management rights] section shall preclude any agency and any labor organization from negotiating . . . procedures which management officials of the agency will observe in exercising any authority under this section." Petitioner argues that "procedures" must be defined, in accordance with its plain meaning, as encompassing only "a particular course of action [or] . . . way of going . . . about the accomplishment of something," or a "series of steps," [58] and that each of its proposals

**50.** See Federal Personnel Manual, ch. 335, subch. 1.

**51.** *Id.,* ch. 335, subch. 3–7 (superseded); see also *Mallard v. Claytor,* 471 F.Supp. 16, 20 (D.D.C.1978); *Canty v. Olivarez,* 452 F.Supp. 762, 766–767 (N.D.Ga.1978); *Mellick v. EEOC,* 410 F.Supp. 736, 737 & n.2 (W.D.Pa.1976).

**52.** Federal Personnel Manual, ch. 335, subch. 3–6 d (superseded). Performance appraisals have continuing relevance in promotion decisions in the federal sector. See *id.* ch. 335, subch. 1–4, Requirement 3.

**53.** See text *supra* at note 46.

**54.** Federal Personnel Manual, ch. 335, subch. 5–1 (superseded) (participation of employee organizations and employees in development and revision of promotion guidelines and plans).

**55.** *Id.,* ch. 335, subch. 5–1 d(2), (3) (superseded).

**56.** Brief for Petitioner at 24–29.

**57.** 5 U.S.C. § 7106(b)(2) (Supp. IV 1980).

**58.** Brief for Petitioner at 25–26, quoting Webster's Third New Int'l Dictionary (unabridged) (1968).

constitutes a mere step in the ultimate assessment of an employee's performance.[59]

■ The distinction between negotiable procedures and nonnegotiable substantive exercises of management authority was discussed at some length in *Department of Defense*.[60] There we recognized that demarcation of substance and procedure "involves questions of judgment and balance, about which reasonable people could easily differ," and was a task best performed by the Authority itself.[61] We also suggested the importance of drawing the line between proposals involving purely procedural steps and proposals "cast in procedural language [which] impinge upon substantive management decisions."[62] The former are removed from the collective bargaining process only to the extent to which they preclude management from "acting at all,"[63] while the latter are similarly immune if their implementation would "directly interfere" with the agency's exercise of rights reserved by Section 7106(a).[64]

■ The construction of § 7106(b) petitioner advances here is, in our view, unduly literal and completely unsupportable. Initially, we reject outright petitioner's characterization of Proposal I, restricting critical job elements to grade-controlling factors, as procedural. The only possible basis for that interpretation is the claim, pressed by petitioner during the administrative proceedings,[65] that standards of any sort are inherently procedural, a position we believe to be untenable. Indeed, acceptance of that thesis would eviscerate all of the management rights that Section 7106(a) is designed to protect.

■ Petitioner's two remaining proposals can, at best, be described as propositions cloaked in procedural garb which encroach upon management's substantive authority.[66] As such they are not subject to collective bargaining to the extent that they would directly interfere with management rights,[67] and the Authority's conclusion that their implementation would do so is manifestly clear from its decision.[68] Proposal III would give petitioner an equal voice in development of performance measures, and would require negotiation in the event of disagreement and reference of any impasse to an independent body.[69] Proposal IV would open the door to arbitral review and awards setting performance standards and selecting critical job elements at variance with those designated by management upon its own assessment of agency priorities.[70] We thus perceive no basis for upsetting the Authority on these aspects of the litigation.

### B. *Application of the Act.*

Finally, petitioner challenges the Authority's determination that the proposals at issue do in fact impinge upon management's reserved right to direct employees

---

59. Proposal I, it is said, merely furnishes a "'particular way of ... going about the accomplishment of [setting critical elements].'" Brief for Petitioner at 25. Proposal III is similarly said to set forth a "'particular way of ... going about the accomplishment of [setting measures of performance]' and a 'particular step adopted for ... accomplishing [that result].'" *Id.* at 26. Finally, Proposal IV is characterized as a "particular step" in the performance-appraisal process and a "check to see that '[the] series of steps have been followed in a regular, orderly definite way.'" *Id.*

60. *Supra* note 2.

61. 212 U.S.App.D.C. at 277, 659 F.2d at 1161.

62. *Id.* at 268, 659 F.2d at 1152.

63. *Id.* at 270, 659 F.2d at 1154.

64. *Id.* at 275, 659 F.2d at 1159.

65. See Response of Exclusive Representative to Agency Statement of Negotiability—Part I: Arguments on Performance Standards, Critical Elements and Specific Proposals, at 3–9 (Jan. 9, 1980), *AFGE Local 1968, supra* note 12.

66. The Authority specifically rejected petitioner's "procedural" characterization of Proposal IV. See *AFGE Local 1968, supra* note 12, at 10; note 33 *supra* and accompanying text.

67. See text at notes 62–64 *supra*.

68. See *AFGE Local 1968, supra* note 12, at 3, 8, 9–11.

69. See text *supra* at notes 26–29.

70. See text *supra* at notes 30–32.

and assign work. Even granting that performance standards and critical job elements ordinarily are nonnegotiable on that account, petitioner argues, it cannot be said that these proposals would embarrass management's exercise of those rights.[71] Petitioner insists that the proposals here are materially different from those found nonnegotiable by the Authority in *National Treasury Employees Union*,[72] which specified exactly the performance standards and critical job elements the union wanted the agency to adopt,[73] and consequently that a different result on negotiability is warranted.

There is undeniably some difference between the proposals in the case at bar and those presented in *National Treasury Employees Union*. But, contrary to petitioner's assertion, the variation is not significant to a decision on bargainability.[74] As petitioner admitted before the Authority,[75] as the Authority duly noted in its decision and as is evident to us,[76] Proposal I restricts the agency's choice of critical job elements to those factors which are grade-controlling. Its effect, therefore, is indistinguishable from that wrought by the proposals involved in *National Treasury Employees Union:* imposition of a limitation upon management's ability to identify and select those elements.[77] Proposal III, requiring as it does formal negotiations on measures of performance and further requiring referral of hopelessly-mired disputes to the Federal Service Impasses Panel,[78] would similarly restrict management's

authority in that area by insisting that it be exercised only with union approval. Since management's ability to establish performance standards and critical job elements is part and parcel of its exclusive right to assign employees and direct work, the Authority cannot be said to have acted arbitrarily or capriciously in deeming these proposals nonnegotiable.

Petitioner also quarrels with the Authority's outcome on Proposal IV, again pointing to an earlier ruling of the Authority for support. Proposal IV, petitioner contends, is comparable to the one found negotiable by the Authority in *AFGE Local 32*,[79] which provided that "all performance standards will be fair and equitable and consistent with the classification standards for the job," and that "an employee who believes a standard does not meet the above criteria may grieve" the question.[80] The Authority's determination that Proposal IV is nonbargainable, petitioner says, amounts to an unexplained reversal of its decision in *Local 32*.[81]

We find this argument unacceptable. The proposal in *AFGE Local 32*, in the Authority's words, merely "established a general non-quantitative requirement by which the application of critical elements and performance standards established by agency management could subsequently be evaluated...."[82] Proposal IV, in stark contrast, would sanction direct challenges to performance standards and critical job elements, and would allow arbitrators to

---

71. Brief for Petitioner at 33–57.

72. *Supra* note 3.

73. The proposal challenged in *National Treasury Employees Union* provided that "to retain his/her position, incumbent must process 9.0 batches per hour." See *National Treasury Employees Union v. FLRA, supra* note 3, at 556–557.

74. Indeed, in its brief in this court petitioner conceded that in many respects the difference between these proposals and those advanced in *National Treasury Employees Union* was merely one of degree. See Brief for Petitioner at 38.

75. See Response of Exclusive Representative to Agency Statement of Negotiability—Part I: Arguments on Performance Standards, Critical

Elements, and Specific Proposals, at 14 (Jan. 9, 1980), *AFGE Local 1968, supra* note 12.

76. *AFGE Local 1968, supra* note 12, at 2.

77. See *National Treasury Employees Union v. FLRA, supra* note 3, at 561–565.

78. See text *supra* at notes 26–29.

79. *Supra* note 22.

80. 3 F.L.R.A. at 790.

81. Brief for Petitioner at 45–47.

82. *AFGE Local 1968, supra* note 12, at 3.

substitute their notions of proper standards and elements for those of management. Given this difference in the respective proposals' effects, it simply cannot be said that the Authority's treatment of Proposal IV is a departure from the principle espoused in *AFGE Local 32.*

 Petitioner additionally urges that the Authority's ruling that Proposal IV was not subject to bargaining is premised on an unarticulated and therefore unsustainable distinction between challenges to performance standards and critical job elements advanced at the time of their adoption, and those made after such standards and elements have been applied to a particular employee.[83] Proposal IV was found nonnegotiable, petitioner contends, because, unlike those in *AFGE Local 32,* it would permit arbitration at the time performance standards and critical elements are established.[84] We agree unhesitatingly with petitioner that an administrative agency must articulate the reasons for its decision, and that those reasons alone provide the basis for judicial assessments of its validity.[85] As we read the decision attacked here, however, there is nothing to indicate the Authority's reliance on the distinction suggested;[86] rather, petitioner seems to be engaging in a guessing-game. The Authority ruled that the disputed portions of Proposal IV were nonnegotiable because they paved the way for substantial interference with management's statutorily-reserved power to direct employees and assign work by licensing arbitral awards that could substitute performance standards and critical job elements different from those previously adopted by management.[87] The timing of this substitution, be it when management first institutes the standards or after they are applied through a performance appraisal, is wholly immaterial.[88]

For these reasons, we find petitioner's challenges to the Authority's decision unpersuasive, and the order under review is accordingly

*Affirmed.*

---

**83.** Brief for Petitioner at 48.

**84.** *Id.*

**85.** See *Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263, 270, 80 S.Ct. 1122, 1126–1127, 4 L.Ed.2d 1208, 1213 (1960); *Ashland Exploration, Inc. v. FERC,* 203 U.S.App.D.C. 235, 240 n.24, 631 F.2d 817, 822 n.24 (1980); *Public Media Center v. FCC,* 190 U.S.App.D.C. 425, 435, 587 F.2d 1322, 1332 (1979).

**86.** To the extent that the Act preserves as bargainable "arrangements for employees adversely affected by the exercise of any [reserved] authority" by management, see 5 U.S.C. § 7106(b)(3) (Supp. IV 1980), it does contemplate a temporal distinction of sorts—an employee is affected only after management action, hardly before. It was on this basis that the Authority found so much of Proposal IV as provided for the grievance of "any [disputed] action taken as a result of a performance appraisal" a proper subject of collective bargaining. *AFGE Local 1968, supra* note 12, at 11–12; see note 12 *supra.* Petitioner however, has not invoked this provision in connection with the claim here discussed.

**87.** See *AFGE Local 1968, supra* note 12, at 10–11.

**88.** Petitioner also contends that in finding these propositions nonnegotiable, the Authority has intruded into their merits and thereby has usurped the role of the Federal Service Impasses Panel. Brief for Petitioner at 58–60. Petitioner argues that the Authority has overlooked the nature of the union proposals as no more than proposals, and thereby has lost sight of the fact that a holding that they are negotiable would merely require bargaining, not adoption. *Id.* This, petitioner insists, amounts to an improper examination by the Authority of the merits of the proposals, a task delegated to the Impasses Panel. Taken to the next logical step, petitioner's definition of "merits" would dictate the conclusion that because any given employee proposal is simply a proposal, not yet a command to management, it is a proper subject of mandatory bargaining between employees and management. That result clearly is not contemplated by the statutory scheme.