DEFENSE LOGISTICS COUNCIL OF AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCALS, Petitioner,

v.

FEDERAL LABOR RELATIONS AUTHORITY, Respondent.

No. 85–1743.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 21, 1986.

Decided Jan. 27, 1987.

Williams, Circuit Judge, concurred in part and dissented in part and filed opinion.

Stuart A. Kirsch, with whom Mark Roth, Washington, D.C., was on the brief, for petitioner.

William E. Persina, Associate Sol., Federal Labor Relations Authority, with whom Ruth E. Peters, Sol., Steven H. Svartz, Deputy Sol., and Ira Sandron, Atty., Federal Labor Relations Authority, Washington, D.C., were on the brief, for respondent.

Before EDWARDS and WILLIAMS, Circuit Judges, and GREEN,* District Judge.

Opinion for the Court filed by District Judge GREEN.

Opinion concurring in part and dissenting in part filed by Circuit Judge WILLIAMS.

JOYCE HENS GREEN, District Judge:

Petitioner Defense Logistics Council of American Federation of Government Employees Locals ("Union") seeks review of a decision of the Federal Labor Relations Authority ("FLRA" or "Authority") finding nonnegotiable a Union proposal to modify the procedures and standards implemented by the Defense Logistics Agency ("Agency") to prevent intoxicated driving on its federal military facilities. Considering the

Union proposals as a package, the FLRA found that they directly interfered with management's right under the Federal Service Labor-Management Relations Statute, Civil Service Reform Act of 1978, Title VII, 5 U.S.C. §§ 7101–7135 (1982 and Supp. 1986), to determine its internal security practices, a right partially protected from bargaining by 5 U.S.C. § 7106(a)(1). We affirm in part and reverse and remand in part.

**I**

In 1983, the Department of Defense implemented Directive 1010.7 ("Directive"), which established procedures for expedited suspension of the driving privileges of military personnel and others on federal installations on the basis of arrest reports and other official documentation of intoxicated driving incidents. The stated goal of the Department's coordinated program of education, identification, law enforcement, and treatment is "to reduce the number of fatalities and injuries suffered by [Department of Defense] personnel and the amount of property damage that result from intoxicated driving." Directive at 2, Joint Appendix ("J.A.") at 6. The Directive requires agencies to establish procedures for expeditiously suspending driving privileges on federal installations regardless of the location of the incident. Under the Directive, an agency must preliminarily suspend an employee's driving privileges when it learns of an arrest or other official documentation of such an incident; a one-year suspension "can be imposed upon conviction, imposition of nonjudicial punishment, or action by civilian authorities leading to suspension or revocation of the individual's driver's license." Directive at 3, J.A. at 7. An employee whose privileges have been preliminarily suspended can request a hearing within five days. *Id.* If the hearing official determines that law enforcement personnel had probable cause to believe that the employee was driving

---

* District Judge Joyce Hens Green of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

while intoxicated, then the preliminary suspension is continued until disposition of the original charge. Directive at 3–4, J.A. at 7–8. The Directive also provides additional penalties for refusal to take a blood alcohol test and for repeat offenses, as well as possible exemptions, for example, on the basis of mission requirements or unusual personal or family hardship. Directive, at 4–6, J.A. at 8–10.

In 1984, under its collective bargaining agreement with the Defense Logistics Agency, the Union presented a series of proposals for negotiation over the implementation of Directive 1010.7, essentially seeking greater procedural and substantive protection for employees who might be affected by the new policy.[1] While agreeing to negotiate with the Union on some proposals, the Defense Logistics Agency declared most of the proposals non-negotiable. The Union then petitioned the FLRA for review.

The FLRA reasoned that the securing and safeguarding of personnel and physical property fall within the purview of an agency's right under 5 U.S.C. § 7106(a)(1) to determine its internal security practices. *Defense Logistics Council of AFGE Locals and Defense Logistics Agency,* 20 FLRA 166, 168 (1986) (citing *AFGE, Local 32 and Office of Personnel Management,* 16 FLRA 40 (1984)). Treating the propos-

als as an inseverable package, the Authority determined that the Union proposals directly interfered with this right by, in certain circumstances, preventing the Agency from expeditiously suspending driving privileges, creating exceptions to the suspension policy, and prohibiting administrative action against an employee for traffic offenses not occurring on Agency premises. The FLRA concluded, therefore, that the proposals were nonnegotiable. *Defense Logistics Council,* 20 FLRA at 168–69. The Union petitions this court for review of the FLRA's decision.

## II

Under the Federal Service Labor-Management Relations Statute, federal agencies must bargain in good faith with employees, 5 U.S.C. § 7114(a)(4), over conditions of employment, 5 U.S.C. § 7103(a)(12), (14), and implementation of any rules and regulations not otherwise exempted from negotiation, 5 U.S.C. § 7117. Among the enumerated substantive management rights exempted from the general requirement of negotiation are the internal security practices of an agency, 5 U.S.C. § 7106(a)(1). The procedures by which management exercises these rights,

---

1. The Union proposal provided:

*Section 2—Employee Rights*

  (a) No action, except for just cause, will be taken against any bargaining employee under this article until there is a conviction by the Court or review procedures under the provisions of *Article 36, Grievance Procedures* have been exhausted.

  (b) All actions taken against the employee will be for just cause.

  (c) No disciplinary action will be taken that is greater than that administered by the courts.

  (d) The affected employee and/or his/her representative may request that the provisions of *Article 39, Stays of Personnel Actions,* be invoked.

  (e) All actions taken by the Employer, under this article are subject to the provisions of *Article 37, Grievance Procedures.*

*Section 3—Exceptions to Suspensions*

  If requested, employees may be granted an exception to the suspension. The following

are some, but not necessarily all, of the reasons that an exception may be granted:

  (a) Physical handicap

  (b) Personal or family hardship

  (c) Lack of available transportation

  (d) Driving is a requirement of the employee's position

  (e) Employee will consider or is enrolled in an employee assistance program.

. . . .

*Section 5—No Administrative Action for Off Premise Offenses Absent a Nexus*

  The Employer will take no administrative action against any employee for off premise offenses as spelled out in *Section 2* above or without there being a nexus (link or connection) to job performance.

*Defense Logistics Council of AFGE and Defense Logistics Agency,* 20 FLRA 166, 166–67 (1986).

  Some of the Union's original proposals were withdrawn by the parties prior to determination by the FLRA and are not at issue in this petition. *Id.* at 166 n. 1.

however, are proper subjects of negotiation, 5 U.S.C. § 7106(b)(2).[2]

■ The Union argues that the Directive is not exempted from negotiation by 5 U.S.C. § 7106(a)(1) because it does not involve internal security practices.[3] We find the FLRA's disposition of this threshold issue to be a reasonable one. "Internal security practices," by definition, comprise actions taken by management to control the risks of activities affecting the integrity and safety of the federal facility. The FLRA has interpreted this phrase to include an agency's plan to secure or safeguard its physical property against internal or external risk. *AFGE, AFL–CIO, Local 32 and Office of Personnel Management,* 14 FLRA 6 (1984), *enforced on other grounds, FLRA v. Office of Personnel Management,* 778 F.2d 844 (D.C.Cir.1985). In arguing that the Directive does not concern exempted internal security practices, the Union relies primarily on *Department of Defense and Headquarters, Eighth U.S. Army Garrison, Youngsan Korea v. FLRA,* 685 F.2d 641 (D.C.Cir.1982), in which this court held that vehicle registration and ration control for federal facility employees involved conditions of employment and not matters of internal security. In that case, however, the agency offered only a "far-fetched theory" in support of its argument that the regulation of those external matters implicated internal security. *Id.* at 648. The theory presented here is not so strained. To the contrary, the FLRA reasonably interpreted the term "internal security" to include a "preventive measure taken by the Agency to guard against [the] harm to its property and personnel" posed by intoxicated drivers. *Defense Logistics Council,* 20 FLRA at 168. The Authority properly concluded therefore that implementation of Directive 1010.7 implicates matters of internal security.

■ This conclusion does not mean, however, that Union proposals involving the Directive are necessarily nonnegotiable. The determination of whether a proposal involving an exempted matter is negotiable turns on whether it is deemed "substantive" or "procedural." While the distinction between these two classifications is "not always crisp," *Department of Defense, Army-Air Force Exchange Service v. FLRA,* 659 F.2d 1140, 1151 (D.C.Cir. 1981), *cert. denied sub nom. AFGE, AFL–CIO v. FLRA,* 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982), the basic approach to analyzing proposals cast in procedural language is to determine whether they specify the criteria by which decisions must be made, or whether they have less direct substantive repercussions. *Id.* at 1152. If a proposal is found to be procedural, then it is nonnegotiable only if it would prevent the agency from "acting at all" in the exercise of reserved management rights. *National Federation of Federal Employees, Local 615 v. FLRA,* 801 F.2d 477 (D.C. Cir.1968). Substantive proposals, on the other hand, are nonnegotiable if they "directly interfere" with agency decisionmaking. *AFGE, AFL–CIO, Local 2782 v. FLRA,* 702 F.2d 1183 (D.C.Cir.1983); *Department of Defense, Army-Air Force Exchange Service,* 659 F.2d at 1159. The

---

**2.** Section 7106 provides in pertinent part:

(a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency—

(1) to determine the mission, budget, organization, number of employees, and internal security practices of the agency; ...

(b) Nothing in this section shall preclude any agency and any labor organization from negotiating—

....

(2) procedures which management officials of the agency will observe in exercising any authority under this section; or

(3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials.

**3.** For the first time on appeal, the Union also attempts to challenge the FLRA's decision on the basis that the proposal was negotiable under 5 U.S.C. § 7106(b)(3), which requires agencies to negotiate "appropriate arrangements" for employees. This court, however, has no jurisdiction to review a challenge not presented in the proceeding before the FLRA. 5 U.S.C. § 7123(c); *Department of Treasury, Internal Revenue Service v. FLRA,* 707 F.2d 574, 579–80 (D.C.Cir.1983).

direct interference test also applies to bargaining proposals that "stand close to the uncertain border between procedure and substance." *National Federation of Federal Employees, Local 1167 v. FLRA,* 681 F.2d 886, 892 n. 8 (D.C.Cir.1982) (citing *Department of Defense, Army-Air Force Exchange Service,* 659 F.2d at 1159).

■ The demarcation of substance and procedure "involves questions of judgment and balance" usually best left to the discretion of the FLRA. *AFGE, AFL–CIO, Local 1968 v. FLRA,* 691 F.2d 565, 572 (D.C. Cir.1982), *cert. denied,* 461 U.S. 926, 103 S.Ct. 2085, 77 L.Ed.2d 927 (1983). Such deference is most appropriate when the Authority is exercising its "special function of applying the general provisions of the Act to the complexities" of federal labor relations. *Bureau of Alcohol, Tobacco & Firearms v. FLRA,* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). Nonetheless, the FLRA's judgment cannot be upheld when it is arbitrary and capricious. 5 U.S.C. § 7123(c) (review of FLRA orders to be made in accordance with 5 U.S.C. § 706). "[W]hile reviewing courts should uphold reasonable and defensible constructions of an agency's enabling Act ... they must not 'rubber-stamp' ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." 464 U.S. at 97, 104 S.Ct. at 444.

■ In this case, the FLRA treated the Union proposals as an inseverable package and applied the "direct interference" test to all of the proposals, some of which are clearly procedural. In light of the clear statutory requirement that agencies negotiate with unions over procedural proposals, 5 U.S.C. § 7106(b)(2), we find this determination to be wholly unreasonable.

The cases cited by the FLRA for the proposition that the Union's proposals were properly treated as a whole are inapposite. In *Local 32, AFGE, AFL–CIO v. FLRA,* 774 F.2d 498 (D.C.Cir.1985), this Circuit approved a decision of the FLRA to not reexamine all the potentially negotiable applications of a single union proposal when one significant application made it nonnegotiable. *Id.* at 505. The court stated that "[t]he Union did not, however, explicitly request that the FLRA consider the proposal separately in each of its possible applications. The FLRA generally does not consider parts of a proposal separately, unless the parties specifically so request.... [T]herefore, the FLRA correctly determined that the RIF and reassignment aspects of the proposal should be considered together." *Id.* (citations omitted). While we would agree with the *Local 32* court that under those circumstances the Authority's decision to not exhaustively examine and distinguish among the various potential applications of a discrete proposal was reasonable, this does not convince us of the validity of the FLRA's presumption that multiple or multi-part proposals cannot be severed for consideration.

An examination of the decisions relied on by the FLRA on the issue of severability convinces us that we cannot condone the application in this case of what the FLRA now calls its "longstanding" practice.[4]

---

**4.** The FLRA's reliance on *National Federation of Federal Employees, Local 1497 and Headquarters, Lowry Technical Training Center (ATC), Lowry Air Force Base, Colorado,* 6 FLRA 9 (1981), as supporting a presumption of inseverability is clearly misplaced. The FLRA did not sever the proposal there because the union (not the agency) requested specifically that the proposal be taken as a whole. *Id.* at 11. The FLRA decision in *AFGE, Local 225 and U.S. Army Armament Research and Development Command, Dover, New Jersey,* 11 FLRA 630 (1983), also lends no support to the Authority's argument for uniform treatment. In that case, the Authority refused to consider whether credit union and payroll deductions were conditions of employment because the record was vague. Without analysis, the FLRA proffered: "in any event, the Union has not asked the Authority to fragment the proposal." *Id.* at 631. This suggestion contradicts the analysis in *Local 1497.*

In later decisions, the FLRA has relied on *Local 225* without illuminating its reasoning. For example, in *National Treasury Employees Union and Internal Revenue Service, San Francisco, California,* 14 FLRA 65 (1984), the FLRA found a union proposal outside the duty to bargain because its subparts were not explicitly made severable. *Id.* at 70. The Authority, how-

Neither has the Authority demonstrated to this court that the practice is grounded in the authorizing statute or supported by persuasive reason. Indeed, the Authority itself has frequently failed to adhere to what it asks us to sanction as its official policy.[5]

Even in the instant case, the Union, the Agency, and the Authority did not consistently treat the proposals as a package, but rather examined them separately. The Union's proposals consisted of three "sections"—2, 3, and 5. The FLRA concluded that "the proposal," *i.e.*, all sections, would directly interfere with the Agency's right to determine its internal security practices, explaining that:

> Specifically, Section 2 of the proposal establishes various standards, which in certain circumstances would prevent the Agency from expeditiously suspending driving privileges pursuant to its practices. Section 3 of the proposal states possible exceptions to suspension of driving privileges on Agency premises. Section 5 requires that no administrative action can be taken against any employee for traffic offenses not occurring on the Agency's premises. Thus, the proposal would, in effect, impose substantive limitations on management's exercise of its right to determine its internal security practices, in particular, the decision as to whether and the circumstances under which the privilege of driving on its premises should be suspended.

*Defense Logistics Council*, 20 FLRA at 168. While the FLRA concluded that all three proposals were nonnegotiable, it viewed them separately. Even the FLRA order notes that neither the Union nor the Agency treated the proposals as an "all or nothing" proposition. *Defense Logistics Council*, 20 FLRA at 166 n. 1. *See also* Statement of Position of the Department of Defense Pursuant to 5 U.S.C. § 7117(c)(3) at 18, 24–25, 30, *Defense Logistics Council*, 20 FLRA 166 (analyzing the proposals by subsection). Indeed, the proposal was well fragmented by the time the FLRA reviewed it. The original proposal had additional sections 1, 2(f), 4(a), 4(b), 6(a), and 6(b). After the Union filed its petition with the FLRA, the Union withdrew its appeal as to section 4(a), and the Agency withdrew its allegations of nonnegotiability as to sections 1, 2(f), 4(b), 6(a), and 6(b).

■ Subject matter may at times, of course, warrant the uniform treatment of union proposals. *See, e.g., Library of Congress v. FLRA*, 699 F.2d 1280 (D.C.Cir. 1983) (all six union proposals related to the working conditions of employees relocated to a new building, *e.g.*, placement of telephones; conformance to fire and safety codes; and installation of ceiling partitions, lockers, showers, and doors on offices). But when union proposals or their subparts

---

ever, analyzed the negotiability of the subparts of one proposal separately, *see id.* at 69–70 & n. 3, and also quite clearly analyzed the four union proposals at issue separately. *See also AFGE, AFL–CIO, Local 1940 and Department of Agriculture, Plum Island Disease Center*, 16 FLRA 816 (1984) (proposals but not subparts considered separately). In *National Treasury Employees Union (NTEU) and Internal Revenue Service*, 14 FLRA 463 (1984), the FLRA similarly failed to explain its deviation from their supposedly standard practice; there, it not only considered the union's proposals separately, but further parsed proposals into sentences. *See id.* at 468–69 (sentences analyzed separately despite absence of union request); *but see id.* at 466–67 (union requested separate consideration of certain sentences).

More recently, the Authority relied on *Local 225*, 11 FLRA 630, in a footnote, but again without analysis. *AFGE, Local 225, AFL–CIO and Department of the Army, U.S. Army Arma-*

ment Research and Development Command, Dover, New Jersey, 17 FLRA 417, 421–22 n. 9 (1985). The proposal in *Local 225*, 17 FLRA 417, would have required the agency to deviate from certain procedures established by the Office of Management and Budget ("OMB") in evaluating contract bids. The Authority found, however, that the OMB procedures were a government-wide rule or regulation and therefore entirely outside the duty to bargain. *Id.* at 420. Even if the practice of presumptively treating union proposals as a package were a valid one, it would not have been applicable because unlike internal security practices, which are only partially exempted from negotiation, government-wide rules and regulations are, under 5 U.S.C. § 7117(a)(1), completely exempted from bargaining.

**5.** *See supra* note 4.

present distinct legal or factual questions, they must be treated differently. *See, e.g., Local 32, AFL–CIO v. FLRA,* 728 F.2d 1526 (D.C.Cir.1984) (affirming the FLRA on one proposal but reversing and remanding on a second); *see also Department of Defense, Army-Air Force Exchange Service,* 659 F.2d 1140 (affirming decision of the FLRA that three proposals were mandatory subjects of collective bargaining, but five were not); *Local 1968,* 691 F.2d at 567 (affirming FLRA determination of nonnegotiability as to certain subparts of union proposals). In terms of form, the Federal Service Labor-Management Relations Statute requires only that there be a "matter" proposed for bargaining, 5 U.S.C. § 7117, and that proposals be sufficiently specific in form or content to enable the Authority to determine whether they are negotiable. *International Brotherhood of Electrical Workers, Local 1245 and U.S. Department of the Interior, Bureau of Reclamation,* 17 FLRA 552, 553 (1985). We proceed, therefore, to examine the Union's proposals individually, rather than as one inseverable proposition.

■ We agree with the Authority's determination that some of the Union's proposals are substantive, directly interfere with management's right to control internal security practices, and are therefore nonnegotiable. Section 2(a) prevents management from taking any action against any employee "until there is a conviction by the Court or review procedures ... have been exhausted"; section 2(b) prohibits suspension not based on "just cause"; and section 2(c) bars action "greater than that administered by the courts." Subsection 3(c) would allow the Agency to exempt employees from suspension if they lack "available transportation."[6] Section 5 prohibits a suspension unless there is "a nexus (link or connection) to job performance." Each of these provisions seeks to modify the criteria by which the Agency determines suspensions. Each is clearly substantive. *Department of Defense, Army-Air Force Exchange Service,* 659 F.2d at 1152. Under the "direct interference" test, therefore, these Union proposals are nonnegotiable since they directly interfere with management's right to determine its internal security practices. *Local 2782,* 702 F.2d 1183. The language of these proposals would substantively alter the decisionmaking criteria used by management in implementing the Directive. Under one of the Union proposals, for example, the Agency could not suspend an employee's driving privileges if the intoxicated incident could not be linked to job performance. The Directive does not require the Agency to prove any such nexus to suspend the license. Without passing judgment on the merits of the Directive,[7] this court has no difficulty finding that the Union's proposals 2(a)–(c), 3(c), and 5 seek to change the substantive criteria, not merely the procedure, by which management decisions would be made.[8] Since the

---

6. During oral argument, the Union conceded that section 3, except for subsection (c)—lack of available transportation—was substantially similar to section E(2)(f) of the Directive. This concession effectively moots the Union's attack on the FLRA's decision as to the other parts of this section.

7. The Union attempts to challenge the validity of the Directive itself on due process grounds, by characterizing its arguments as an attempt to focus the court's attention on the purpose and significance of the rights involved in implementing Directive 1010.7. Any such challenge should be raised directly and not through the vehicle of a petition for review of an FLRA decision on the negotiability of various Union proposals. Under 5 U.S.C. § 7123(c), the court has jurisdiction only over the questions deter-

mined in the FLRA proceeding and may not consider an "objection that has not been urged before the Authority" absent extraordinary circumstances. 5 U.S.C. § 7123(c).

8. In *AFGE, Local 1931 v. FLRA,* 802 F.2d 1159 (9th Cir.1986), the Ninth Circuit affirmed the FLRA's decision that two union proposals also involving Directive 1010.7 were nonnegotiable. Those proposals would have required: (1) that employees arrested for intoxicated driving be allowed to maintain their driving privileges until convicted by a civilian court, and (2) that suspensions of employees who refuse to take a sobriety test be in accordance with state law and any disciplinary action taken for such refusal be no greater than that imposed by the state court. *Id.* at 1161. Those union proposals are clearly similar to some substantive propos-

Union proposals directly interfere with the prerogatives of management as defined under the Federal Service Labor-Management Relations Statute, we therefore agree with the FLRA that the Agency properly declined to negotiate with the Union with respect to sections 2(a)–(c), 3(c), and 5.

■ In contrast, however, the Union proposals contained in sections 2(d) and 2(e) are procedural, rather than substantive, do not prevent the Agency from "acting at all" in suspending driving privileges, and are therefore negotiable. Section 2(d) would require the Agency to allow an employee to invoke a stay of certain suspensions under Article 39 of the Master Agreement between the Agency and the Union. *See* Article 39, J.A. at 38. Under section 2(e), all actions taken by the Agency to suspend an employee's license would be subject to the grievance procedures provided by Article 36, which allows multi-step exhaustion of internal remedies in the event of a threatened or actual suspension. Neither of these proposals would prevent the Agency from "acting at all" to suspend the licenses of employees under the Directive. While the proposals may delay proceedings against an employee, "the issue [is] *when,* not *whether,* the agency could execute its management right to remove or suspend an employee.... A stay pending resort to the grievance procedure might postpone enforcement of a management right, but that delay alone ... 'would not take a proposal outside the statutory obligation to negotiate.'" *National Treasury Employees Union v. FLRA,* 712 F.2d 669, 672–73 (D.C.Cir.1983) (emphasis in original). Mere interference with the rights of management is insufficient to make a proposal nonnegotiable. *Association of Civilian Technicians, Montana Air Chapter v. FLRA,* 756 F.2d 172, 179 (D.C.Cir.1985) ("this obligation to bargain over the 'impact and implementation' of agency decisions extends to proposed procedures or arrangements that would to

als—sections 2(a)–(c) and 5—at issue in this petition. In fact, the FLRA decided both cases the same day, relying on the reasoning of its

some extent interfere with the exercise of management rights under section 7106(a)"). By erroneously treating the Union proposals as a whole, the FLRA improperly determined sections 2(d) and 2(e) to be nonnegotiable.

## CONCLUSION

To avoid recurring disputes, we urge the FLRA, consistent with our decision today, to explicitly proclaim and consistently promote a policy on the severability of union proposals that will give full effect to the statutory mandate that federal agencies must bargain in good faith with unions over procedures implemented by management officials in exercising their authority under 5 U.S.C. § 7106.

Accordingly, we affirm the determination of the FLRA that sections 2(a)–(c), 3(c), and 5 of the Union's proposals are nonnegotiable, but reverse and remand sections 2(d) and 2(e) to the FLRA for entry of an order requiring bargaining with the Union.

WILLIAMS, Circuit Judge, concurring and dissenting:

Sections 2(d) and 2(e) of the union's proposal, *ante* at 236 n. 1, are, as the majority states, procedural; under the law of the circuit they are subject to bargaining unless the Federal Labor Relations Authority ("FLRA" or the "Authority") has a reasonable basis for concluding that they would prevent the Defense Logistics Agency from "acting at all" with regard to the management right in question. Because it is uncertain whether the Authority made such a finding with respect to each subpart of section 2, I would remand to the Authority to resolve whether, under the standard set out in *National Federation of Federal Employees, Local 615 v. FLRA,* 801 F.2d 477 (D.C.Cir.1986) (Scalia, Justice, then Judge) (hereinafter *"Local 615 "*), either of the two procedural subparts, viewed independently, prevents the Defense Logistics Agency from acting at all.

*Defense Logistics Council* decision for its *Local 1931* decision.

The acting-at-all test, Justice Scalia noted (in a portion of the opinion not joined by Judge Starr), "conceals rather than explains the FLRA's policy judgments which ultimately determine whether substantive management rights have realistically been impaired." *Local 615*, 801 F.2d at 483. In a series of examples, Justice Scalia considered several dispositions by the FLRA that demonstrated that the definition of the management right tends to control the determination of whether the procedure prevents the agency from exercising its authority "at all." Thus, whether a proposal barring dismissal of an employee who is in a drug or alcohol program and "making progress" toward acceptable performance prevents management from acting at all depends upon whether the management right is defined as " 'dismissal of an employee who has failed to bring his performance up to standards' or rather simply 'dismissal of an employee'." *Id.* at 482.

In *Local 615*, the disputed proposal was that any investigation "will normally be initiated within sixty (60) days after the incident in question, or within sixty (60) days after the Employer became aware of the incident." *Id.* at 478. The court noted that circuit precedent required it to affirm "if there is a reasonable basis for the FLRA's conclusion that the proposal ... would *in certain circumstances* establish an absolute bar to the exercise of the protected management right...." *Id.* at 479 (emphasis added). The court concluded that while the proposal would not prevent the agency from acting at all where it investigated within 60 days, or even in instances where it investigated after 60 days and there was a reason for the delay, it would have such an effect where 60 days elapsed and the agency had "no particular reason" for waiting that long. *Id.* at 480. Accordingly, the court affirmed the Authority's determination that the proposal was not negotiable. *Local 615* clearly leaves the Authority very considerable leeway in applying the acting-at-all standard.

Here the Authority found that section 2 "establishes various standards, which in certain circumstances would prevent the Agency from *expeditiously suspending* driving privileges pursuant to its practices." *Defense Logistics Council of AFGE Locals and Defense Logistics Agency*, 20 FLRA 166, 168 (1985) (emphasis added). The statement may be a reasonable finding that sections 2(d) and 2(e) of the union's proposal would completely prevent the agency from "expeditiously suspending" driving privileges, and, as such, may represent a reasonable judgment that the agency's "management rights have realistically been impaired." On the other hand, if the Authority was treating all portions of the union's proposal as a package, then it likely made no finding on the effect of sections 2(d) and 2(e) taken separately. Accordingly, I join the court in remanding to the Authority, but believe that *Local 615* requires that we leave open the possibility of its reasonably concluding that each of sections 2(d) and 2(e) is nonnegotiable.

I agree with the majority that the Authority's rules on severability have not been clearly articulated or applied, but note that such rules must have considerable flexibility. They are always applied to language selected by those who frame the proposals, persons who are obviously not under the Authority's control. To some extent, then, the Authority should be able to allow (and require) a proposer, if it fails to meet whatever objective criteria the Authority might establish for treating proposals separately, to specify precisely in what units it wishes the proposals to be analyzed.[1] The Authority's adoption of clear rules on the subject could save the Authority and the courts considerable aggravation.

---

1. Of course, where proposals designated as severable will in the aggregate prevent management from acting at all on a reserved subject even though each alone would not, the Authority must be entitled to consider the aggregate effect.