**DEPARTMENT OF THE ARMY, U.S. ARMY ABERDEEN PROVING GROUND INSTALLATION SUPPORT ACTIVITY, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent.**

**DEPARTMENT OF THE ARMY, U.S. ARMY ABERDEEN PROVING GROUND INSTALLATION SUPPORT ACTIVITY, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent.**

**DEPARTMENT OF THE ARMY, U.S. ARMY ARMAMENT, MUNITIONS AND CHEMICAL COMMAND, ROCK ISLAND, ILLINOIS, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent.**

Nos. 88–1895, 88–1896, 88–1897.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 30, 1989.

Decided Dec. 1, 1989.

**468**

Robert V. Zener, Attorney, Dept. of Justice, with whom Jay B. Stephens, U.S. Atty. and Leonard Schaitman, Attorney, Dept. of Justice were on the brief for petitioners in all cases.

William R. Tobey, Attorney, Federal Labor Relations Authority, with whom William E. Persina, Acting Sol., Federal Labor Relations Authority, was on the brief for respondent in all cases.

Before WALD, Chief Judge, and MIKVA, Circuit Judge and GESELL,* District Judge.

Opinion for the Court filed by Chief Judge WALD.

---

WALD, Chief Judge:

In these consolidated cases, we review determinations by the Federal Labor Relations Authority ("FLRA") that union proposals concerning (1) independent testing of new and split urine samples, (2) safeguards for ensuring the qualification of testing personnel, and (3) evidentiary presumptions in demonstrations of employees' legitimate drug use, were not inconsistent with federal drug testing guidelines and were within the Army's duty to bargain. We conclude that (1) a proposal allowing an Army employee to provide his personnel supervisor with evidence of new or split urine samples in order to rebut an Army finding of illegal drug use is nonnegotiable; (2) requiring the Army to impose safeguards assuring the qualification and certification of lower-level laboratory personnel is nonnegotiable; and (3) presuming the validity of an employee's documentation of legitimate drug use is negotiable.

## I. STATUTORY AND REGULATORY FRAMEWORK

We begin by describing the statute and regulations that are in issue here.

### A. Relevant Statutory Provisions

These cases arise in the context of the Federal Service Labor–Management Relations Act of 1978 ("FSLMRA" or "Act"), 5 U.S.C. §§ 7101 *et seq.* (1988). The Act mandates that to the extent not inconsistent with any federal statute or regulation, federal agencies have a duty to bargain in good faith over matters that are the subject of nongovernment-wide rules or regulations for which no compelling need exists. *Id.* § 7117(a).[1] The Act also outlines the

---

* The Honorable Gerhard A. Gesell, of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

1. 5 U.S.C. § 7117 states in relevant part:
    (a)(1) Subject to paragraph (2) of this subsection, the duty to bargain in good faith shall, to the extent not inconsistent with any Federal law or any Government-wide rule or regulation, extend to matters which are the subject of any rule or regulation only if the rule or regulation is not a Government-wide rule or regulation.
    (2) The duty to bargain in good faith shall, to the extent not inconsistent with Federal law or any Government-wide rule or regulation, extend to matters which are the subject of any agency rule or regulation referred to in paragraph (3) of this subsection only if the Authority has determined ... that no compelling need (as determined under regulations pre-

parameters of management rights. In particular, the "procedures" that agency officials observe in exercising managerial authority, as well as "appropriate arrangements for employees adversely affected" by official exercises of authority, are negotiable. *Id.* § 7106(b). Subject to these provisos, however, management retains full, nonnegotiable control over an agency's internal security practices and over its personnel, budgetary, and organizational decisions. *Id.* § 7106(a).[2] *See generally Office of Personnel Management v. FLRA,* 864 F.2d 165, 167–71 (D.C.Cir.1988); *American Federation of Gov't Employees, Local 32 v. FLRA,* 853 F.2d 986, 991 (D.C.Cir. 1988) (discussing interrelationship between §§ 7117 and 7106). FLRA is responsible for effecting the aims of the FSLMRA, 5 U.S.C. § 7105(a)(1), and this court has jurisdiction to review FLRA final orders for arbitrariness and capriciousness, *id.* §§ 7123(a), (c).

## B. *Drug Testing Guidelines*

In September 1986, by Executive Order, President Reagan directed federal agencies to develop plans to achieve a drug-free federal workplace. Each federal agency was mandated to establish criteria to "test for the use of illegal drugs by employees in sensitive positions." Exec. Order No. 12,-564, 51 Fed.Reg. 32,889, 32,890 (1986), *re-*

*printed in* 5 U.S.C. § 7301 note at 909, 910 (1988). Section 4(d) of the Order authorizes the Secretary of Health and Human Services ("HHS") "to promulgate scientific and technical guidelines for drug testing programs, and agencies shall conduct their drug testing programs in accordance with these guidelines once promulgated." *Id.,* 51 Fed.Reg. 32,891, 5 U.S.C. § 7301 note at 910. Section 503 of the 1987 Supplemental Appropriations Act, Pub.L. No. 100–71, 101 Stat. 391, 468–71, *reprinted in* 5 U.S.C. § 7301 note at 908, provided that before agency drug testing would be funded, HHS had to issue "mandatory guidelines" that "establish comprehensive standards for all aspects of laboratory drug testing and laboratory procedures" carried out under Executive Order 12,564, as well as "criteria for certification and revocation of certification of laboratories to perform drug testing." 101 Stat. 469, 5 U.S.C. § 7301 note at 908. HHS issued Mandatory Guidelines for Federal Workplace Drug Testing Programs, 53 Fed.Reg. 11,970–89 (1988) ("Guidelines"), Joint Appendix ("J.A.") at 110–29, in April 1988.

We consider the relevant aspects of the Guidelines in our discussions of the proposals at issue. For now, we note that the substantive portion of the Guidelines is divided into two parts. Subpart B specifies the drugs for which federal employees may

---

scribed by the Authority) exists for the rule or regulation.

5 U.S.C. § 7116(a)(5) establishes that an agency's "refus[al] to consult or negotiate in good faith with a labor organization as required by this chapter" is an "unfair labor practice."

**2.** 5 U.S.C. § 7106 provides:

(a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency—

(1) to determine the mission, budget, organization, number of employees, and internal security practices of the agency; and

(2) in accordance with applicable laws—

(A) to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees;

(B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted;

(C) with respect to filling positions, to make selections for appointments from—

(i) among properly ranked and certified candidates for promotion; or

(ii) any other appropriate source; and

(D) to take whatever actions may be necessary to carry out the agency mission during emergencies.

(b) Nothing in this section shall preclude any agency and any labor organization from negotiating—

(1) at the election of the agency, on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;

(2) procedures which management officials of the agency will observe in exercising any authority under this section; or

(3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials.

be tested, establishes standards and procedures for laboratory drug testing, and provides for the collection and proper custody of urine samples. Of particular relevance here is the requirement that each agency appoint a Medical Review Officer ("MRO"), a licensed physician who is supposed to review and verify positive test results and to authorize retests when he deems them necessary. Subpart C lays out standards and procedures for the periodic review of laboratories performing drug testing, as well as criteria for the granting and revocation of their certification. *See generally* 53 Fed.Reg. 11,980–89, J.A. at 120–29.[3]

## C. *Army Regulations*

In August 1985, the Department of Defense issued Directive 1010.9, authorizing urinalysis testing of civilians occupying or applying for certain "critical jobs." *See generally National Federation of Federal Employees v. Cheney*, 884 F.2d 603, 605–06 (D.C.Cir.1989). In early 1986, the Army implemented this Directive through Army Regulation 600–85, Interim Change No. I11, "Alcohol and Drug Abuse Prevention and Control Program" (Feb. 10, 1986), J.A. at 135. Under these regulations, some "critical" civilian employees, as well as prospective employees for critical positions, involving altogether some 2% of Army employees, Brief for Petitioners ("Pet.Br.") at 6, are screened for drug use. Current employees are subject to testing (1) on a periodic, random basis; (2) when the Army has probable cause to believe that the employee is under the influence of a controlled substance while he or she is on duty; and (3) as part of an accident or safety investigation. *Id.* ¶ 5–14e, J.A. at 137. Prospective employees are tested prior to commencing employment. *Id.* The regulations also set

out general testing procedures, actions to be taken in the event of a confirmed positive result, and the requirements for proper notice to tested employees. *Id.* ¶¶ 5–14c through f, J.A. at 136–39.

## D. *Inquiry on Appeal*

The National Federation of Federal Employees ("NFFE") locals involved in these cases made numerous negotiating proposals pursuant to the Army's 1986 regulations. Of the 31 proposals originally ruled upon by FLRA in the cases presented for our review, four remain at issue in this consolidated proceeding. We now consider the negotiability of these proposals.

Our inquiry proceeds as follows. First, pursuant to 5 U.S.C. § 7117(a), we determine whether the proposal is "not inconsistent with" the Guidelines.[4] If the proposal is inconsistent with the Guidelines, we must conclude that the proposal is nonnegotiable. If, however, the proposal is not inconsistent with the Guidelines, we also decide, pursuant to § 7106, whether the proposal involves a pure management right and is, therefore, nonnegotiable, or whether it involves an exception to nonnegotiable management rights and is, consequently, negotiable.

Since the first inquiry involves the HHS Guidelines, we do not owe deference to FLRA's findings. On the other hand, the second inquiry requires us to examine FLRA's consideration of the proposals in light of the FSLMRA, which is FLRA's enabling statute; in that analysis, we do owe deference to FLRA's findings. *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983); *National Treasury Employees Union v. FLRA*, 848 F.2d 1273, 1275 (D.C.Cir.1988).

---

**3.** At oral argument, petitioners' counsel represented that the number of private laboratories that have gained HHS certification has grown substantially in recent months.

**4.** As FLRA has explained, pursuant to Executive Order 12,564 and the 1987 Supplemental Appropriations Act, the Guidelines are binding on executive agencies, the uniformed services, and any other federal employing unit except the U.S. Postal Service, the Postal Rate Commission, and

employing units and authorities in the judicial and legislative branches. Consequently, the final Guidelines are "Government-wide regulations" within the meaning of § 7117(a). *NFFE, Local 15 and Dep't of the Army, U.S. Army Armament, Munitions and Chemical Command, Rock Island, Illinois,* 33 F.L.R.A. (No. 85) 436, 438–39 (1988) [hereinafter cited as *Rock Island II*], J.A. at 41–42.

## II. Split and New Samples

### A. *Procedural History*

The first two proposals at issue here involve an Army employee's right to present independent results from a split or new urine sample to his personnel supervisor. One proposal stated:

> At each and every step of testing employees have the option to have a urinalysis test by an independent lab at his/her cost utilizing the existing sample or a new sample. If independent testing refutes employer results, employee will be reimbursed for any cost associated with the testing process.

*NFFE, Local 15 and Dep't of the Army, U.S. Army Armament, Munitions and Chemical Command, Rock Island, Illinois*, 30 F.L.R.A. (No. 115), slip op. at 22 (1988) [hereinafter cited as *Rock Island I*], J.A. at 22. In relevant part, the other proposal provided:

> At a minimum the sample will be divided for the purpose of the employee to retain his or her portion with instructions for proper storage provided. In the event of a confirmed positive the employee's retained portion will be confirmatory tested.

*NFFE, Local 2058 and U.S. Army Aberdeen Proving Ground Installation Support Activity*, 31 F.L.R.A. (No. 25), slip op. at 15 (1988) [hereinafter cited as *Aberdeen, Local 2058–I*], J.A. at 96.

Initially, FLRA deemed both proposals negotiable on the grounds that they did not directly interfere with the Army's ability to carry out its drug testing program. Rather, FLRA treated the proposals as making available to the employee additional procedures to check the accuracy of the Army's drug testing results. *Rock Island I*, 30 F.L.R.A. (No. 115), slip op. at 26–28, J.A. at 26–28; *Aberdeen, Local 2058–I*, 31 F.L. R.A. (No. 25), slip op. at 16, J.A. at 97. When the Army appealed, we remanded the proposals to FLRA for further consideration in light of the newly-issued HHS Guidelines. *Dep't of the Army, U.S.*

*Army Armament, Munitions and Chemical Command, Rock Island, Illinois v. FLRA*, No. 88–1239 (order of May 25, 1988) [hereinafter cited as *Rock Island Remand*], J.A. at 38; *Dep't of the Army, U.S. Army Aberdeen Proving Ground, Installation Support Authority v. FLRA*, No. 88–1310 (order of July 18, 1988), J.A. at 99. On remand, FLRA determined that the proposals were not inconsistent with the Guidelines. Accepting the union's interpretation that the new or split sample would be used for independent tests whose results would be given to the employee's personnel supervisor but not to the MRO, FLRA held:

> As we discussed with respect to Proposal 8, the final Guidelines do not preclude an employee from presenting supplementary evidence to a supervisor in an attempt to refute the result of an official Agency drug test conducted under the final Guidelines. Therefore, there is no inconsistency between the proposal and the final Guidelines regarding the role of the Medical Review Officer and the official test results.[5]

*Rock Island II*, 33 F.L.R.A. (No. 60) at 452, J.A. at 55; *see also NFFE, Local 2058 and U.S. Army Aberdeen Proving Ground Installation Support Activity*, 33 F.L.R.A. (No. 85) 702, 708–10 (1988) [hereinafter cited as *Aberdeen, Local 2058–II*], J.A. at 106–08 (similar analysis). The Army now appeals this FLRA final order.

### B. *Analysis*

■ As Part I–D, *supra*, indicated, our review of FLRA's negotiability determination involves two inquiries: whether the proposal is inconsistent with the Guidelines, and whether it improperly impinges on management rights.

The Guidelines envision the MRO performing a "final review" of urine test results. Guidelines, § 2.7(a), 53 Fed.Reg. 11,-985, J.A. at 125. The MRO's role is to "review and interpret positive test results obtained through the agency's testing pro-

---

**5.** Proposal 8 allowed an employee to "retain[ ] a portion of the sample for freezing and later use in case of inadvertent break in chain of custody or loss of identification of samples." *Rock Island I*, 30 F.L.R.A. (No. 115), slip op. at 22, J.A. at 22.

gram." *Id.* § 2.7(b), 53 Fed.Reg. 11,985, J.A. at 125.[6] The MRO "shall not, however, consider the results of urine samples that are not obtained or processed in accordance with these Guidelines." *Id.* In addition, "[s]hould any question arise as to the accuracy or validity of a positive test result, only the [MRO] is authorized to order a reanalysis of the original sample and such retests are authorized only at laboratories certified under these Guidelines." *Id.* § 2.7(e), 53 Fed.Reg. 11,986, J.A. at 126. As we discuss further in Part IV, *infra*, the MRO is also directed to "examine alternate medical explanations" for positive results. *Id.* § 2.7(b), 53 Fed. Reg. 11,985, J.A. at 125. After verifying a positive result, the MRO "shall refer" the case to the agency Employee Assistance Program and to the "management official empowered to recommend or take administrative action." *Id.* § 2.7(c), 53 Fed.Reg. 11,986, J.A. at 126. The official manual for MROs stresses that "the MRO does *not* adjudicate, punish, or otherwise arrange consequences for employees whose drug-positive urines apparently do not result from medical treatments or from problems in handling or analyzing drug samples." United States Dep't of Health and Human Services, *Medical Review Officer Manual: A Guide to Evaluating Urine Drug Analysis* 6 (1988) (emphasis in original) [hereinafter cited as *MRO Manual*], J.A. at 243.

These provisions indicate that under the Guidelines, the MRO makes all final determinations whether a particular sample demonstrates an employee's illegal drug use. While the MRO is not involved in personnel decisions, his or her medical evaluation of positive test results and of an employee's documentation of their illegitimacy is conclusive. As we have seen, however, FLRA has interpreted the proposals in issue to allow employees to present new or split sample results to a supervisor "in an attempt to refute the result" of the official Army drug test. *See* page 471, *supra*.[7]

Our review of FLRA's order must be based on FLRA's reading of the proposals; we are not at liberty to suggest an entirely new gloss. *Securities and Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). FLRA's understanding of the purpose of the proposals at issue in fact comports with NFFE's interpretation. We find, however, that that understanding is inconsistent with the Guidelines. Since the MRO is supposed to make the *final* determination whether the Army's drug test indicates illegal drug use, allowing a nonmedical personnel supervisor to *refute* that result seems to us necessarily inconsistent with the Guidelines. While enabling the employee to provide supplementary evidence, such as new or split samples, to facilitate the supervisor's personnel decision might well be consistent with the Guidelines, FLRA's clearly expressed understanding that the proposal would allow the employee to refute the MRO's medical determination forces us to conclude that the proposal does not pass muster.

**6.** In responding to comments when it issued the Guidelines, HHS explained that it views the MRO as "retaining overall responsibility for reviewing and interpreting positive test results." Response to Comments, 53 Fed.Reg. 11,971, 11,-974 (1988) [hereinafter cited as *Response*].

**7.** While FLRA presents this interpretation in light of its discussion of *Rock Island* Proposal 8, *see* note 5, *supra*, FLRA does not make clear whether under the proposals before us, it believes that the employee could claim that the MRO's medical determination was wrong or simply that an administrative mix-up in the chain of custody occurred. Since Proposal 8 seemed to cover the latter claim, and since the plain meaning of "refute the result" does not limit the grounds for the employee's claim, we understand FLRA to interpret the proposal at issue here to allow the employee to present evidence to the supervisor that seeks to rebut the MRO's medical finding. Our reading is borne out by FLRA's statement in *Aberdeen, Local 2058–II* that its interpretation of a similar proposal there was "[b]ased on the Union's explanation," which stated that the proposal "is intended to give an employee evidence which may be presented to a supervisor *in order to rebut a positive finding.*" 33 F.L.R.A. (No. 85) at 709, J.A. at 107 (emphasis added).

Contrary to FLRA's suggestion, our decision does not undermine the employee's rights within the Army's personnel system. *See* Brief for the Federal Labor Relations Authority at 24. The Guidelines provide the employee with an opportunity to persuade the MRO that the test result was incorrect or justifiable. As a medical officer, the MRO alone is qualified to evaluate the employee's claim; the personnel supervisor, lacking medical expertise, is not in a position to evaluate claims of medical mistake or to refute the MRO's medical finding. A proposal giving the supervisor that authority would undercut the Guidelines' command that agencies appoint a medical officer to make final medical decisions.

Since we find that the proposals, as interpreted by NFFE and FLRA, are inconsistent with the Guidelines, we do not need to examine the proposals in light of management rights. We conclude that the proposals are not negotiable.

### III.  QUALIFICATIONS FOR TESTING PERSONNEL

#### A.  *Procedural History*

The next proposal at issue provides in part:

> The Employer agrees to provide safeguards to assure [that] the urinalysis testing for affected employees is not performed by unqualified or uncertified operators or test personnel.

*Rock Island I*, 30 F.L.R.A. (No. 115), slip op. at 17, J.A. at 17. Initially, FLRA found this proposal negotiable on the grounds that it was an appropriate arrangement for employees adversely affected by Army drug testing. FLRA felt that by trying to improve the accuracy of test results, the proposal attempted to mitigate the foreseeable adverse consequences of the Army's drug testing program. *Id.* at 19, J.A. at 19. When the Army appealed, we remanded the case to FLRA for further consideration in light of the then-new HHS Guidelines. *Rock Island* Remand. On remand, FLRA found that this proposal was not inconsistent with the Guidelines, which specifically prescribe the functions of only the laboratory director and the day-to-day opera-

tions supervisor. *Rock Island II*, 33 F.L.R.A. (No. 60) at 441–42, J.A. at 44–47. We now consider the Army's appeal of FLRA's decision on remand.

#### B.  *Analysis*

█ We find that the qualifications proposal is inconsistent with the HHS Guidelines. Laboratories must meet all of the Guidelines' pertinent provisions in order to qualify for certification. Guidelines § 3.3, 53 Fed.Reg. 11,987, J.A. at 127. Sections 2.3(b) and (c) of the Guidelines lay out precise qualifications for the laboratory manager and day-to-day supervisor; § 2.3(d) states, however, that "[o]ther technicians or nontechnical staff shall have the necessary training and skills for the tasks assigned." 53 Fed.Reg. 11,982, J.A. at 122. According to § 3.6, the Guidelines "establish exclusive standards for qualifying or certifying those laboratory personnel involved in urinalysis testing whose functions are prescribed by these Guidelines." 53 Fed.Reg. 11,987, J.A. at 127. A laboratory's certification under the Guidelines "shall be a determination that these qualification requirements have been met." *Id.*

In its Response to Comments, HHS provided further explanation about the absence of specific qualifications for operators and other test personnel:

> [The Guidelines] do not specify requirements for other personnel, including employees who perform the assays, but rather depend on the ability of those responsible individuals to select and oversee properly qualified employees in each specific laboratory, and they depend on outcome measures of laboratory performance such as performance testing.... Within this framework, the Guidelines do not establish qualifications for additional laboratory positions.

> The individuals who perform the tests are a vital part of any laboratory operation, and there is no intent to minimize their importance by omitting qualifications for them. However, by holding the appropriate laboratory officials responsible for review and certification of all test results before they are sent forward

and by relying on various quality control and quality assurance measures, performance testing and on-site evaluations to provide direct measures of the quality of testing, [HHS] expects to ensure a standard of excellence in drug testing without setting additional personnel requirements.

Response, 53 Fed.Reg. 11,971, J.A. at 111. Although these remarks do not carry the same mandatory authority as the Guidelines themselves, they suggest that NFFE's qualifications proposal is inconsistent with the spirit, if not the letter, of the Guidelines.

Requiring a laboratory to meet the additional standards envisioned by the proposal would be tantamount to saying that the Guidelines did not provide "exclusive" standards for qualifying or certifying test personnel. Any standards developed under the proposal would become particularly problematic if the testing personnel of a laboratory certified under the Guidelines failed to meet them. Suppose, for instance, that an Army employee received a positive test result from a laboratory whose testing personnel met the Guidelines standard but not the additional proposal-based standards. In that event, NFFE presumably would bring the Army before a labor arbitrator, claiming that the Army had violated its own standards. The arbitrator would then face a dilemma between upholding the exclusivity of the Guidelines and enforcing the additional safeguards adopted pursuant to the proposal. The framework of management responsibility for laboratory staff that HHS laid out in its Response to Comments, mandating that employees meet the "outcome measure" of job performance, would be undermined to the extent that laboratory management would, additionally, have to hire only employees who meet the stricter standards generated pursuant to the proposal.

The proposal's potential conflicts with the Guidelines provide sufficient grounds for our holding that NFFE's qualifications proposal is not negotiable. We note that FLRA's determination of the proposal's consistency with the Guidelines does not warrant special deference because it did not involve an interpretation of a provision of the FSLMRA. *See* Part I–D *supra*. In addition, FLRA itself has interpreted the FSLMRA to render nonnegotiable any union proposal that "conflicts at all" with a government-wide regulation. *Federal Union of Scientists and Engineers, Nat'l Ass'n of Gov't Employees and Naval Underwater Systems Center, Newport, RI,* 23 F.L.R.A. (No. 50) 360, 362 (1986). Because of the troublesome scenarios we have described, we find this qualifications proposal inconsistent with the Guidelines. Since the proposal fails the first prong of our inquiry, we need not evaluate its impact on management rights; the proposal is, therefore, nonnegotiable.

IV. PRESUMPTION FAVORING THE EMPLOYEE'S DOCUMENTATION

A. *Procedural History*

We come now to the final proposal at issue in these consolidated cases. It states:

Employees shall not be required to disclose the legitimate use of a specific drug at the outset of the program. Employees will have an opportunity to provide documentation supporting legitimate usage upon a positive test result. *This documentation shall be presumed to be a valid explanation of the positive urinalysis.*[8]

*NFFE, Local 178 and U.S. Army Aberdeen Proving Ground Installation Support Activity,* 31 F.L.R.A. (No. 24) 226, 233 (1988) (emphasis added) [hereinafter cited as *Aberdeen, Local 178–I*], J.A. at 57, 64. Initially, FLRA determined that this proposal was negotiable because in creating a rebuttable presumption in support of the validity of the employee's documentation, it played a procedural role. *Id.* at 234–35, J.A. at 65–66 (discussing proposal's consistency with 5 U.S.C. § 7106(b)(2)). After this court's remand, *U.S. Army Aberdeen Proving Ground Installation Support Activity v. FLRA,* No. 88–1309 (order of July 18, 1988), J.A. at 72, FLRA found that the proposal was consistent with the HHS Guidelines because it left the MRO free to find that no legitimate explanation justified

---

**8.** Only the italicized sentence was contested.

an employee's drug use. *NFFE, Local 178 and U.S. Army Aberdeen Proving Ground Installation Support Activity,* 33 F.L.R.A. (No. 71) 521, 526 (1988) [hereinafter cited as *Aberdeen, Local 178–II*], J.A. at 73, 78.

### B. *Analysis*

#### 1. *Consistency with the Guidelines*

▉ We affirm the FLRA's finding that this proposal is consistent with the Guidelines. The Guidelines state that

> [i]n carrying out this responsibility [to review and interpret positive test results obtained through the agency's testing program], the [MRO] shall examine alternate medical explanations for any positive test result. This action could include conducting a medical interview with the individual, review of the individual's medical history, or review of any other relevant biomedical factors. The [MRO] shall review all medical records made available by the tested individual when a confirmed positive test could have resulted from legally prescribed medication.

Guidelines § 2.7(b), 53 Fed.Reg. 11,985, J.A. at 125.[9] If the MRO "determines there is a legitimate medical explanation for the positive test result, he or she shall determine that the result is consistent with legal drug use and take no further action." *Id.* § 2.7(f), 53 Fed.Reg. 11,986, J.A. at 126. The *MRO Manual* states that the MRO "*shall* review any information provided by an employee attempting to show legitimate use of a drug." U.S. Dep't of Health and Human Services, *MRO Manual,* at 6 (emphasis added), J.A. at 243.

As a preliminary matter, we note our agreement with FLRA's conclusion that the presumption covers only medical documentation. As FLRA pointed out, Executive Order 12,564, governing the HHS Guidelines, states that "[b]efore conducting a drug test, the agency shall inform the employee to be tested of the opportunity to submit medical documentation that may support a legitimate use for a specific drug." Exec. Order 12,564, 51 Fed.Reg. 32,891, 5 U.S.C. § 7301 note at 910. We therefore accept FLRA's reading of the proposal as limited to "provid[ing] employees with an opportunity to submit *medical* documentation stating the specific reason for the positive test." *Aberdeen, Local 178–I,* 31 F.L.R.A. (No. 24) at 234, J.A. at 65 (emphasis added).

The crux of the dispute between the Army and FLRA, as the parties have framed it, is whether the presumption in the proposal is rebuttable or conclusive. FLRA's conclusion that the presumption is rebuttable is consistent with the range of situations in which courts have found evidentiary presumptions to be rebuttable. *See, e.g., United States v. Alatishe,* 768 F.2d 364, 371 (D.C.Cir.1985) (interpreting presumption of defendant's nonappearance in 1984 Bail Reform Act); *Legille v. Dann,* 544 F.2d 1, 6–7 (D.C.Cir.1976) (resolving competing presumptions about normal mail delivery and regular Patent Office procedures through application of "bursting bubble" approach to presumptions);[10] *United States v. Jessup,* 757 F.2d 378, 383 (1st Cir.1985) (same as *Alatishe,* but also outlining "middle ground" approach that gives presumptions somewhat more evidentiary weight than does bursting bubble approach); *see also* Fed.R.Evid. 301 ("... a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption").

In our view, however, whether the presumption is "rebuttable" or "conclusive" is not the central issue. Evidentiary presumptions operate in forums that involve at least some trial-type formalities. As outlined in the Guidelines, however, the employee's presentation of documentation to the MRO is loosely defined and includes few, if any, of the accoutrements of formal litigation. Rather, the MRO is simply in-

---

**9.** HHS envisioned that the mechanism for communication between the employee and the MRO would be flexible and need not involve a face-to-face interview. Response, 53 Fed.Reg. 11,974, J.A. at 114.

**10.** Under the bursting bubble theory, any evidence contrary to the presumption makes the presumption disappear. *See McCormick on Evidence* 974 (E. Cleary ed. 1984).

structed to review relevant medical records and, when suitable, to conduct an interview with the tested employee, in order to evaluate alternate medical explanations for a positive test result. While the Guidelines state that the MRO "shall give" the employee "an opportunity to discuss the test result," there is no indication that this discussion is meant to have any formal adversarial characteristics. Guidelines § 2.7(c), 53 Fed.Reg. 11,985–86, J.A. at 125–26. Thus, we find the application of theories of evidentiary presumptions out of place in this context.

FLRA appears to have shared our doubts that the presumption in the proposal at issue imposes a burden of production akin to the showings that are generally necessary to refute other evidentiary presumptions. Rather, based on NFFE's representations, FLRA construed the presumption in the proposal to have a much narrower effect. Instead of reading the proposal to require the Army or the MRO to make an actual evidentiary showing to rebut the employee's documentation, FLRA understood the proposal to impose on the MRO only a burden to explain her decision not to accept that documentation once it was proffered. FLRA held that the presumption "merely requires the Agency to accept valid medical documentation when *it has no basis to rebut that documention.*" *Aberdeen, Local 178–I,* 31 F.L.R.A. (No. 24) at 235, J.A. at 66 (emphasis added).[11] After HHS issued the Guidelines, FLRA interpreted the proposal to "place[ ] a burden on the Agency *to explain* any rejection of the employee's medical documentation." *Aberdeen, Local 178–II,* 33 F.L.R.A. (No. 71) 525, J.A. at 77 (emphasis added). The MRO remains "free to find that there is not a legitimate medical explanation when he or she determines that the evidence justifies that finding." *Id.* at 526, J.A. at 78.

FLRA's understanding of the proposal is a reasonable one and is, therefore, controlling as far as our review is concerned. NFFE had argued before FLRA that the proposal "intends only that employees have the opportunity to submit valid medical evidence to demonstrate the legitimate use of a controlled substance...." *Id.* at 523, J.A. at 75. FLRA reads the proposal fairly only to require that the MRO be able to provide an articulable justification for discrediting the employee's documentation and for finding a positive result.

Further, we find the proposal, as interpreted by FLRA, consistent with the Guidelines because it affirms the parameters of the MRO's inquiry set out therein. Absent the proposal, the MRO is not free to act arbitrarily and capriciously in rejecting an employee's documentation. The MRO may not reject an employee's documentation without providing some justification or explanation for doing so. By creating a rebuttable presumption that imposes on the MRO only a burden to explain why an employee's medical documentation is inadequate, the proposal makes explicit the responsibility that the MRO already bears. If the MRO can satisfactorily explain why the employee's documentation is not worthy of credibility, the MRO can uphold the positive test result. Even absent the proposal, the MRO would have to offer some explanation in rejecting the employee's documentation to avoid the risk of being perceived as acting arbitrarily and capriciously. Thus, contrary to the Army's claim, the proposal does not increase the evidentiary weight of the employee's evidence, but merely ensures that her evidence receives due consideration.[12]

### 2. *Management Rights*

■ Having determined that the proposal is consistent with the MRO's role under the Guidelines, we now examine whether

---

**11.** Since the MRO is an Army appointee, she acts, in effect, as the Army's agent when she evaluates the employee's medical documentation.

**12.** In most cases the proposal may well have little actual effect on the outcome of a drug test. Nonetheless, as respondent's counsel pointed

out at oral argument, NFFE perceives the proposal as providing the intangible benefit of clarifying the roles of the Army, the MRO, and the employee in evaluating the legitimacy of the employee's drug use. In any event, the proposal's likely limited impact is not relevant to an analysis of its negotiability.

the proposal infringes management rights. At issue here is whether the proposal qualifies, as FLRA determined, as a negotiable "procedure" observed by agency officials in exercising their authority to discipline or remove employees. *Aberdeen, Local 178–I,* 31 F.L.R.A. (No. 24) at 233–35, J.A. at 64–66. Although, as this court has noted, the line between procedure and substance in the context of the FSLMRA is blurry, *Dep't of Defense v. FLRA,* 659 F.2d 1140, 1151–52 (D.C.Cir.1981), *cert. denied,* 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982), "the basic approach to analyzing proposals cast in procedural language is to determine whether they specify the criteria by which decisions must be made, or whether they have less direct substantive repercussions." *Defense Logistics Council v. FLRA,* 810 F.2d 234, 237 (D.C.Cir. 1987). The first type of proposal is generally substantive, the latter procedural. If the proposal is procedural, it is negotiable unless it prevents the agency from "acting at all" in exercising its management rights; if it is substantive, it is negotiable unless it "directly interferes" with agency decisionmaking. *Id.* We accord substantial deference to FLRA's demarcation between substance and procedure. *Id.* at 238.

While the proposal at issue requires that the MRO be able to present a rational explanation for contradicting the employee's documentation of legitimate use, even in the proposal's absence the MRO must have some basis for denying the validity of the employee's documentation. The proposal, therefore, parallels the MRO's mandated duty under the Guidelines to examine alternate medical explanations for the employee's drug use. As such, the presumption does not "substantively alter the decisionmaking criteria" of the MRO in implementing the Guidelines and the Army's drug testing program. *Compare id.* at 240. Rather, the primary function of the proposal is to provide explicit protection against arbitrary decisionmaking by the MRO. Its protocol for the presentation of evidence related to the legitimacy of an employee's drug use is primarily procedural.[13] And, clearly, this proposal does not prevent the Army from "acting at all" in exercising its reserved rights first to decide whether the employee has engaged in illegal drug use and, subsequently, to take disciplinary action against him. *Cf. id.* at 237. In short, the presumption "tinker[s] with agency policy without defeating its purpose," but, critically, does not "abolish an agency policy or render it merely voluntary." *American Federation of Gov't Employees, AFL–CIO, Local 2441 v. FLRA,* 864 F.2d 178, 182 (D.C.Cir.1988). As a result, the proposal does not impermissibly interfere with a management right and is negotiable.

## V. Conclusion

In sum, we conclude that: (1) allowing an employee to present to his supervisor evidence of a new or split urine sample in order to rebut the Army's finding of illegal drug use is not negotiable; (2) requiring the Army to establish additional safeguards over and above those set out in the HHS Guidelines to ensure the qualification of lower-level testing personnel is not negotiable; and (3) establishing a presumption that requires the MRO to be able to explain her rejection of an employee's medical documentation of legitimate drug use is negotiable. We remand these consolidated cases to FLRA for proceedings consistent with this opinion.

*Remanded.*

---

**13.** The Army argues that choice of law doctrine indicates that evidentiary presumptions are substantive and, as such, that this proposal excessively interferes with Army management prerogatives. *See* Pet.Br. at 44 n. 10. In light of stronger arguments in favor of this presumption's procedural nature, discussed *supra,* and our view that presumptions are "mere procedural devices," *Legille,* 544 F.2d at 10, we do not find the Army's citation of choice of law doctrine dispositive.